[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14846

_____

D. C. Docket No. 8:13-cr-00207-SCB-TGW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

FREDDIE WILSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 5, 2015)

Before ED CARNES, Chief Judge, COX, Circuit Judge, and ROYAL,[*] District
Judge.

ROYAL, District Judge:

_____

[*]Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia,
sitting by designation.

Appellant Freddie Wilson appeals his convictions and sentence for converting to his personal use United States Treasury checks issued as a result of fraudulently filed federal income tax returns. At trial, Wilson claimed he was a legitimate check casher and did not know the Treasury checks were fraudulent. The jury, however, rejected Wilson's defense and on July 10, 2013, convicted him on all fourteen counts of his indictment: six counts of Theft of Government Funds, in violation of 18 U.S.C. § 641 (Counts 1-6); six counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Counts 7-12)[1]; one count of Conducting an Unlawful Monetary Transaction, in violation of 18 U.S.C. § 1957 (Count 13); and one count of Obstructing a Criminal Investigation, in violation of 18 U.S.C. § 1505 (Count 14). The district court sentenced Mr. Wilson to serve a total of 102 months imprisonment.

On appeal, Mr. Wilson challenges his convictions and sentence on three main grounds: (1) the evidence was insufficient to support any of his convictions; (2) the district court erred in admitting the following four key pieces of evidence: (a) the testimony of Sherman Brown – a convicted felon and associate of Wilson; (b) tax returns and refund checks related to uncharged conduct; (c) IRS Special Agent Christian Daley's testimony that all of the tax-refund checks Mr. Wilson deposited resulted from fraudulent tax returns; and (d) certain text messages from Wilson's

---

[1]Although the jury found Wilson guilty on all fourteen counts, the district court dismissed the aggravated identity theft charge in Count 10 post-verdict because the corresponding theft of government funds conviction in Count 4 was a misdemeanor.

former attorney to an IRS agent relating to the Obstruction charge; and, finally, (3) the district court erred at sentencing in calculating the amount of the loss and/or the number of victims.

After careful review, we find Wilson's arguments unconvincing and for the following reasons AFFIRM his convictions and sentence.

## BACKGROUND

Freddie Wilson was the sole owner of Against All Odds Bail Bonds, Inc. in Tampa, Florida, and had been operating as a bail bondsman since 2001. In 2012, Mr. Wilson fatefully decided to expand into the check-cashing business.

On June 27, 2012, Wilson completed a license application to legally operate as a check casher in the State of Florida. On his application, Wilson verified that he would comply with the federal Antimoney Laundering Program and implement certain policies and procedures, including that he would verify customer information, file reports, and create and maintain records. Wilson acknowledged that Florida law required check cashers to keep copies of the fronts and backs of all checks, record all fees charged to cash the checks, maintain a daily cash reconciliation summarizing all cash received, and keep copies of valid identification and thumbprints affixed to checks greater than $1,000. Wilson also acknowledged that Florida law required check cashers to maintain a secure area for cashing checks with either bullet proof

3

glass or security cameras.

The license application also required Wilson to identify the financial institution where he would be negotiating checks. Five days prior to completing his application, Wilson opened a checking account at Hancock Bank and informed the bank that he would be using the account for his check-cashing business. In the application, however, Wilson identified another bank as the financial institution where he would be negotiating checks. Nowhere on the license application did he identify the Hancock Bank account.

Although he did not disclose it to authorities, Wilson began vigorously using the Hancock Bank account in his check-cashing business. In a span of only three months—from June 22 through September 30, 2012—Wilson deposited more than $336,000 into the account. Ninety-nine percent of the funds deposited were from 37 United States Treasury tax-refund checks totaling about $333,000; less than ten checks were non-Treasury checks, which accounted for less than one percent of the total deposits at Hancock Bank. Wilson was the only authorized signor on the account and the only person who deposited the checks.

The evidence at trial established Wilson's Hancock Bank account activity was not consistent with a legitimate check casher. The operations manager at Hancock Bank testified that Wilson came into the bank and deposited checks or withdrew cash

4

two to three times per week, sometimes making multiple deposits in a single day. This activity struck her as unusual because business owners would typically make deposits only once or twice a week.

Particularly striking was the fact Wilson used the money in the Hancock Bank account almost exclusively for personal expenses. The checks Wilson wrote from the account included payments for his daughter's orthodontist and day school, his utility and insurance bills, Home Depot, Wal-Mart, a 2011 Camaro, and to Wilson himself totaling $110,445, which accounted for about one-third of the total amount deposited. The debit card transactions also showed that Wilson used the account for personal expenses. The transactions included withdrawals from numerous ATMs and payments to restaurants, gas stations, hotels, airlines, liquor stores, and the Seminole Hard Rock Casino for $33,000. In a span of only three months, the amount of debit card transactions totaled $127,511.73.

Under Florida law, as a check casher, Wilson could lawfully charge no more than five percent of the total amount of the check. Thus, in an account consistent with a legitimate check-cashing business, deposits are normally accompanied by withdrawals, and the balance is often very minimal. Wilson's account, however, never had a balance below $13,000 or $14,000. Moreover, legitimate accounts typically show 80-90% of the cash being paid to check holders, not used for personal

5

expenses. After noticing the unusual account activity, Hancock Bank's compliance department closed Wilson's account in September 2012. The account had a closing balance of $140,000, an amount strikingly uncharacteristic for a legitimate check-cashing business.

Christian Daley, a special agent with the Criminal Investigation division of the Internal Revenue Service who had worked on dozens of cases involving the filing of fraudulent tax returns requesting refunds, investigated Wilson's activities. He determined that the 37 tax returns from which the IRS issued the tax-refund checks Wilson deposited into his Hancock Bank account were fraudulent. He examined the Hancock Bank account records, the canceled refund checks that were negotiated through the account, and the original tax returns that were filed that caused the refund checks to be issued.

From this evidence, Agent Daley identified several indicators of fraud, including that the refund checks were in large dollar amounts and in whole dollar amounts, e.g., $39,000. In addition, many of the tax-refund checks Wilson deposited were for the exact same amount, and the IRS sent refund checks to neighboring addresses. For example, Wilson received a U.S. Treasury check made payable to Millie Arcadi for $9,074, dated August 31, 2012, which Wilson deposited on September 17. Wilson also received a U.S. Treasury check made out to Alfred Malay

6

for the exact same amount, with an address next door, that Wilson deposited into his Hancock Bank account on the same day. Agent Daley requested records of Form-1099s issued from multiple banks to support the interest payments that individuals reported on their tax returns with corresponding checks that went into Wilson's Hancock Bank account. However, no such records existed. He pointed out that Wilson did not disclose the Hancock Bank account to either the State of Florida on his application for a check casher license or to FinCEN—the Financial Crimes Enforcement Network—on that application to register Against All Odds as a check casher.

The evidence at trial established that the victims identified in the charged counts did not file the IRS tax returns associated with the tax-refund checks Wilson deposited into his account. They did not earn the large amounts of interest claimed on the returns. They did not receive the tax-refund checks made payable to them. The victims never transacted any business with Wilson or Against All Odds. And they did not endorse the backs of the refund checks with their signatures. Indeed, one of the victims had been deceased four months when Wilson deposited two refund checks issued in her name and purportedly endorsed with her signature.

To establish Wilson's knowledge and intent, the government relied on the testimony of Sherman Brown, a convicted felon and associate of Wilson. Brown

7

testified that he sold Wilson tax-refund checks, helped Wilson obtain social security numbers, observed Wilson file fraudulent tax returns, and accompanied Wilson to retrieve tax-refund checks in different neighborhoods. Brown grew up in the same neighborhood with Wilson and has been in and out of jail his entire life. In January 2011, Brown was released from prison and was selling checks to make money. In October 2011, he reconnected with Wilson and started selling him checks. Brown sold Wilson around 50 checks and observed him go to stores, cash the checks, and come back with money. Wilson preferred checks "with the statue of liberty on them," checks for less than $10,000, and checks made payable to the recently deceased. Tr. Trans., Doc. 105, p. 114, 120.

Toward the end of 2011 and beginning of 2012, Brown accompanied Wilson to different motels offering free Wi-Fi and observed Wilson file false tax returns on the IRS website. Also in the beginning of 2012, Brown observed Wilson purchase social security numbers from "some guys" at various apartment complexes. *Id.* at p. 119. On four or five occasions in February of 2012, Brown rode with Wilson to retrieve checks from different addresses in neighborhoods on the outskirts of town. Brown last saw Wilson in June 2012, prior to Brown's arrest in July.

Wilson testified at trial that he had not seen Brown in 15 years, never bought a Treasury check, and never filed a false tax return. Wilson claimed that all of his

8

customers possessed the proper identification and credentials. He claimed that he was defrauded and was a "victim here, too." Tr. Trans., Doc. 106, p. 167-68.

Wilson testified he charged a ten percent fee to cash the checks. When asked how he obtained the money to cash checks for his customers, Wilson stated he would keep $30,000 to $40,000 in his safe at home; his customers would call ahead, and he would go home to retrieve the money. Sometimes, his customers would drive with him when he went to deposit their checks at Hancock Bank, and his customers would wait for him at a nearby Steak n' Shake. He further claimed that he obtained money from the Hard Rock Seminole Casino.

In January 2013, federal agents executed a search warrant at Wilson's Against All Odds Bail Bonds and neighboring grocery store. Although Wilson wrote thousands of dollars of checks to himself, purportedly for his grocery store's inventory, the store had empty shelves and no cash register, with only a jar of pickles in the refrigerator. The agents found nothing to indicate Wilson was complying with the State's requirements for legitimate check-cashing businesses. They found no completed copies of check-cashing applications, no copies of drivers' licenses, no copies of checks cashed over $1,000 with thumbprints, no video surveillance, nor any software program to capture applicant information. Indeed, Agent Daley testified they saw nothing indicating it was a legitimate check-cashing business, not even a

9

cash register. There was a pass-through window separating the grocery store from the bail bonds side, but it was flimsy and unsecure. The agents seized six boxes of documents and two hard drives.

After the agents seized Wilson's records, Wilson contacted Agent Daley to retrieve his bail bonds records so he could continue conducting his bail bonds business. Agent Daley agreed to give him copies, and around February 14, 2013, Daley brought three boxes full of Wilson's records to a FedEx copy center to be copied. After they were copied, the FedEx manager contacted a woman from Wilson's office to come pick up the boxes. Wilson came to pick up the boxes, and the FedEx manager gave Wilson all six boxes, the originals and copies. Approximately a month later, Wilson learned from his attorney that he needed to return the original records. Wilson agreed to return them by 8:30am on March 16, but he failed to return any boxes until later that afternoon. Wilson returned only two boxes which clearly did not contain all of the records—one box was half full, and the other box was three-quarters full.

Wilson was arrested at the end of March 2013. When Agent Daley asked him why he originally took all six boxes Wilson repeatedly said, "I didn't take them. I didn't take them." Tr. Trans., Doc. 106, p. 57. Wilson acknowledged that he only returned two boxes, and when Daley asked him about the third box, Wilson just

shrugged his shoulders.

Over Wilson's objections on hearsay and constitutional grounds, the district court allowed evidence of text messages from Wilson's attorney to Agent Daley. On April 18, 2013, Wilson's attorney texted Agent Daley that "Freddie is willing to return the files to you. Where can we meet?" *Id.* at p. 60. Agent Daley responded instructing that Wilson bring the files to the IRS office. Thus, on April 19, 2013, about two months after Agent Daley initially dropped the records at FedEx to be copied and approximately one month after Wilson delivered the other two boxes, Wilson delivered the third and final box.

Wilson testified he mistakenly took the boxes with the original records and attributed the delay in returning the boxes to his attorney, claiming his attorney did not instruct him to return the boxes until April 19.

The jury convicted Wilson on all counts in the indictment. The Presentence Investigation Report (PSI) included a 4-level increase to Wilson's offense level under U.S.S.G. § 2B1.1(b)(2)(B) because his offenses involved more than 50 victims. The PSI also included a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(H) because the total estimated loss caused by Wilson's crimes exceeded $400,000. The total estimated loss figure in the PSI included fraudulent tax-refund checks Wilson deposited in other accounts at Wells Fargo and Bank of America. Like the evidence

at trial regarding the funds deposited in the Hancock Bank account, he used the funds in the other accounts for personal expenses, including large casino transactions. Agent Daley testified at the sentencing hearing that he looked at the bank records and determined the tax-refund checks were fraudulent, as he saw no legitimate bail-bond business expenses, the majority of the funds were used for personal expenses, and many of the payees were deceased. Moreover, he concluded that Wilson was using the same scheme to generate false returns. Over Wilson's objections, the district court ruled that the probation office had correctly calculated Wilson's guideline range and sentenced him to serve 102 months imprisonment.

## DISCUSSION

### I.    Sufficiency of the Evidence

Wilson contends that the evidence at trial was insufficient to support his convictions for theft of government funds, aggravated identity theft, and obstruction of a criminal investigation. We find the record contained ample evidence to sustain all of Wilson's convictions.

Wilson moved for judgment of acquittal on the theft of government funds and obstruction of a criminal investigation counts, and therefore we will review those challenges *de novo*. *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013). We must consider the evidence in the light most favorable to the government

and draw all reasonable inferences and credibility choices in favor of the jury's verdict, which "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id*.

Wilson, however, did not move for judgment of acquittal on his convictions for aggravated identity theft, and thus we review Wilson's challenges as to those convictions only for plain error. *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011). We may reverse only if the error is plain, affects Wilson's substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1312 n. 6 (11th Cir. 2010).

### A. Theft of Government Funds

A defendant may be convicted for theft of government property under 18 U.S.C. § 641 if the government establishes that (1) the money described in the indictment belonged to the United States or an agency thereof; (2) the defendant appropriated the property to his own use; and (3) the defendant did so knowingly with intent to deprive the government of the money. *United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993) (en banc). Wilson contends the evidence presented at trial was insufficient to establish that he knew the tax-refund checks he deposited were issued

13

from fraudulently issued tax returns or he intended to steal those funds. We disagree.

"In this Circuit, to establish the requisite criminal intent, the government need only prove that defendant knowingly used government property for [his] own purpose[] in a manner that deprived the government of the use of that property." *United States v. Lanier*, 920 F.2d 887, 895 (11th Cir. 1991). The defendant must know that his taking of property is an unlawful conversion. *Morissette v. United States*, 342 U.S. 246, 270-71, 72 S. Ct. 240, 253-54, 96 L.Ed. 288 (1952). "[K]nowing conversion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion." *Id.*

The evidence at trial, when viewed in the light most favorable to the verdict, was more than sufficient to allow a reasonable jury to find Wilson knowingly converted the funds and to convict him on all six counts of theft of government funds. The payees of the tax-refund checks in the six charged accounts never did business with Wilson, did not file the tax returns associated with the tax-refund checks, and did not endorse the checks Wilson deposited into his Hancock Bank account. Moreover, Wilson's business establishment contained no records such as fingerprint cards, copies of picture identifications, or completed check-cashing applications showing Wilson verified the identities of the payees as required under state law. In

14

completing the application for licensure, Wilson knew the State required these security measures, and a jury could reasonably conclude he knowingly disregarded them.

Moreover, a jury could certainly infer that Wilson was not running a legitimate check-cashing business, as evidenced by the sheer volume of money Wilson deposited almost exclusively from United States Treasury checks—over $336,000—in a span of only three months; the fact that he used the money almost exclusively for personal expenses, including $33,000 at a casino and over $110,000 in payments to himself; that his account balance never stayed below $13,000; and that Wilson made deposits and withdrawals up to two or three times per week, sometimes multiple times a day. In addition, the jury could infer that Wilson knowingly hid his Hancock Bank account from authorities, as he did not disclose the account on his check-cashing license application or his FinCEN application despite having opened the account prior to filing the applications.

Moreover, Sherman Brown's testimony established that Wilson was actively involved in compiling and filing fraudulent tax returns which resulted in the issuance of tax refunds. Finally, the jury could disbelieve Wilson's own testimony and rely on that testimony as substantive evidence of his guilt. *See United States v. Kendrick*, 682 F.3d 974, 985 (11th Cir. 2012). Thus, as the district court recognized, the evidence

15

was "fairly overwhelming" that Wilson acted knowingly and willfully, and certainly sufficient to support his convictions for theft of government funds. Tr. Trans., Doc. 106, p. 102-103.

## B. Aggravated Identity Theft and "Means of Identification"

Wilson further argues the evidence was insufficient to sustain his convictions for aggravated identity theft. He claims the use of the victims' names on the refund checks, with no other identifying information, is not sufficient to identify a specific individual, and thus cannot constitute a "means of identification" under 18 U.S.C. §1028A. We disagree.

This issue is one of statutory interpretation. We must determine whether the use of someone's name and forged signature on a United States Treasury check sufficiently identifies a specific individual to qualify as a "means of identification" under 18 U.S.C. § 1028A. We review properly preserved questions of statutory interpretation *de novo*. *United States v. Kraczack*, 331 F.3d 1302, 1305 (11th Cir. 2003). However, where a defendant fails to present the issue to the district court, like Wilson in this case, we review only for plain error. *United States v. Smith*, 459 F.3d 1276, 1282-83 (11th Cir. 2006). As discussed below, we find no error, much less plain error.

This Court has not previously resolved this specific issue in a published

16

opinion, and there appears to be some conflict in the circuits on whether the use of someone's name qualifies as a "means of identification" under 18 U.S.C. § 1028A. *Compare United States v. Mitchell*, 518 F.3d 230 (4th Cir. 2008) (holding a bare name alone was not sufficient to identify the specific individual as required under the statute), *with United States v. Blixt*, 548 F.3d 882 (9th Cir. 2008) (holding a forged signature constitutes the use of that person's name and thus qualifies as a "means of identification" under the statute). While there can usually "be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it," *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (internal quotation and citation omitted), we will address the merits of Wilson's argument to bring some guidance on this issue in this Circuit.

"The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. Segarra*, 582 F.3d 1269, 1271 (11th Cir. 2009) (internal quotation and citation omitted). We will not "look at one word or term in isolation, but instead [will] look to the entire statutory context." *Id.* (internal quotation and citations omitted). We must interpret a statute "in a manner consistent with the plain language of the statute unless doing so would lead to an absurd result." *Id.* (citation omitted).

17

We find the plain language of 18 U.S.C. § 1028A resolves this issue and hold that the use of a person's name and forged signature sufficiently identifies a specific individual to qualify as a "means of identification" under the aggravated identity theft statute. The aggravated identity theft statute provides, in part:

> (1) In general. – whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years. 18 U.S.C. § 1028A(a)(1).

The felony violations enumerated in subsection (c) include theft of government funds, in violation of 18 U.S.C. § 641. 18 U.S.C. § 1028A(c)(1).

The statute defines the term "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1027(d)(7). Under the statute, the use of a name, alone or in conjunction with any other information, clearly constitutes a means of identification so long as the name could be combined with other information to identify a specific individual.

We agree with the Ninth Circuit's reasoning in *United States v. Blixt* that "[b]y using the word 'any' to qualify the term 'name,' the statute reflects Congress's intention to construct an expansive definition" that includes a signature. 548 F.3d at 887 (citing *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 128 S. Ct. 831, 169

18

L.Ed.2d 680 (2008) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'")). Indeed, a signature is understood to be a person's written name. *See* Black's Law Dictionary (10th ed. 2014) (defining "signature" as a "person's name or mark written by that person or at the person's direction.").

Here, the United States Treasury checks were made payable to six individuals and were endorsed with those individuals' forged signatures. This evidence was sufficient to constitute a "means of identification" to identify a specific individual under the statute.

## C. Obstruction of an Investigation

Under 18 U.S.C. § 1505, it is a crime to "corruptly . . . influence[], obstruct[], or impede[] or endeavor[] to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." The term "corruptly" means "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b).

Wilson contends his conviction for obstruction of an investigation must be overturned for two reasons: (1) the evidence was insufficient to support a finding that

19

he acted "corruptly" or with intent to impede the due administration of justice, and (2) the evidence presented at trial was a variance from the allegations in the indictment. We disagree on both counts.

First, the evidence at trial was sufficient to allow a reasonable jury to find Wilson acted corruptly and to convict him of obstruction. A reasonable jury could have concluded that Wilson acted corruptly both by taking the original documents from FedEx and by not returning the originals in a timely manner, thus converting the records to his own use. Wilson testified at trial that he mistakenly took the original documents. However, Wilson did not tell the arresting agent that he had taken the documents by mistake. Instead, when the agent asked Wilson why he had taken the boxes, Wilson wholly denied taking them, repeating "I didn't take them. I didn't take them." Tr. trans., Doc. 106, p. 57. The jury could reasonably rely on Wilson's conflicting explanations as evidence of his "consciousness of guilt." *See United States v. Holbert*, 578 F.2d 128, 129 (5th Cir. 1978)[2]. Moreover, the jury could have inferred that Wilson knew he was withholding documents from the attorney's text message that Wilson was "willing to return the files." Tr. Trans., Doc. 106, p. 60. Finally, the jury could have disbelieved and rejected Wilson's own testimony that he had taken the originals by mistake and considered his testimony as substantive

---

[2] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

evidence of his guilt. *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.").

Second, the evidence presented at trial was not a variance from the allegations in the indictment. Because Wilson failed to raise this argument at trial, we review it for plain error. To obtain reversal under plain-error review, Wilson must show that there is: "(1) error, (2) that is plain, and (3) that affects substantial rights. If all conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Davila*, 749 F.3d 982, 993 (11th Cir. 2014) (internal quotation and citation omitted).

The obstruction count charged that Wilson "did corruptly obstruct, and impede, or endeavor to instruct and impede, the due and proper administration of the law under which a pending proceeding, that is, a criminal investigation, that was being had before the Department of Justice and IRS—Criminal Investigation, by taking, removing and converting to his own use documents that were lawfully seized during the execution of a federal search warrant and were in the care, custody, and control of FedEx Office" in violation of 18 U.S.C. § 1505. Wilson argues the indictment charged him with taking records, and the proof at trial was that he failed to

promptly return them.

A variance "exists where the evidence at trial proves facts *different* from those alleged in the indictment." *United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984) (emphasis in original). A variance "requires reversal only when the defendant can establish that his rights were substantially prejudiced thereby." *United States v. Flynt*, 15 F.3d 1002, 1005 (11th Cir. 1994). In order to show substantial prejudice from a variance, a defendant must show that the proof at trial differed so greatly from the charges that he was "unfairly surprised and was unable to prepare an adequate defense." *United States v. Alred*, 144 F.3d 1404, 1415 (11th Cir. 1998).

Under plain error review, Wilson fails to show a variance occurred that substantially prejudiced his rights. The indictment charged that Wilson corruptly obstructed a criminal investigation by taking, removing, or converting the documents. As explained above, the proof at trial comported with that charge.

## II.     Evidentiary Objections

Wilson contends that the district court erred in admitting the following evidence at trial: (1) Sherman Brown's testimony implicating Wilson in illegal activity; (2) thirty-one tax returns and tax-refund checks the government did not charge in the indictment; (3) Agent Daley's testimony that all of the tax-refund checks Wilson deposited—the 6 charged and the 31 uncharged—resulted from

22

fraudulent tax returns; and (4) certain text messages from Wilson's former attorney to Agent Daley. As discussed below, we find no error.

### A. Sherman Brown's Testimony

Wilson contends the district court erred in admitting Sherman Brown's testimony because the conduct Brown described was not sufficiently similar to the charged conduct to be relevant, and the prejudice of the testimony outweighed its evidentiary value. We disagree.

Before addressing the merits of Wilson's arguments, we must determine the appropriate standard of review. Wilson contends an abuse of discretion standard applies because he objected to Brown's testimony before trial, and Federal Rule of Evidence 103(b) relieved his obligation to renew the objection at trial to preserve the issue for review. The government disagrees and argues the more stringent plain error standard applies because the district court's pretrial ruling was not definitive, and thus Wilson was required to renew the objection at trial. After careful consideration, we conclude that Wilson failed to preserve this issue for review, and thus plain error review is appropriate.

Rule 103(b) states, "[o]nce the court rules *definitively* on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b) (emphasis added); *see also Tampa*

23

*Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1178 (11th Cir. 2013) ("[U]nder the Federal Rules of Evidence, it is [not] necessary for a party to renew an objection to evidence when the district court has definitely ruled on the party's motion *in limine*."). Here, the district court did not definitively rule on the admissibility of Brown's testimony. Addressing Wilson's pretrial objection to Brown's testimony, the district court merely issued a provisional ruling. Throughout its discussion, the court used equivocal language stating, "[k]eeping in mind that none of this evidence has been actually offered yet," tr. trans., doc. 104, p. 46, and "should Sherman Brown testify," *id.* at p. 48, and "I think Mr. Brown's testimony can be either intrinsic or extrinsic." *Id.* The court neither "denied" or "overruled" the objection nor used decisive language such as "rule," "decide," or "conclude." *Compare Tampa Bay Water*, 731 F.3d at 1178, n. 5 (district court's pre-trial ruling was sufficiently definitive where district court stated "motion [to exclude] is not going to be granted"; and "that is my ruling").

Indeed, the district court informed Wilson that the ruling was contingent upon an objection at trial: "So to the extent that Mr. Brown is going to testify, and *should his testimony be objected to* – I don't know for sure exactly what he's going to say, so there may be other objections, but that's my thought, that it would seem to be both intrinsic and extrinsic under 404(b)." Tr. Trans., Doc. 104, p. 49 (emphasis added).

24

Even if counsel for Wilson was unsure whether the ruling was sufficiently definite, the rule "imposes the obligation on counsel to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that point." Fed. R. Evid. 103(b) advisory committee's note. Wilson failed to renew the objection at trial, and thus we can only review the admission of Brown's testimony for plain error.

The trial court committed no plain error. Indeed, the trial court properly admitted Brown's testimony as intrinsic evidence that explained the chain of events surrounding the context and set-up of the charged crimes and as necessary to complete the story of the charged crimes. *See United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) ("Evidence not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to compete the story of the crime for the jury."). Brown's testimony explained how Wilson came to participate in the fraudulent activity, establishing the context, motive, and set-up of how Wilson knowingly converted fraudulently issued tax-refund checks from fraudulent IRS tax returns. Brown's testimony related to events from October 2011, through June 2012, which is sufficiently linked in time and circumstance with the charged check conversions occurring from July 31, 2012,

25

through September 26, 2012. [3]

Moreover, Brown's testimony was not unduly prejudicial under Rule 403. "Rule 403 is an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence." *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1211 (2009). Indeed, "the test under rule 403 is whether the other acts evidence was dragged in by the heels solely for prejudicial impact." *Id.* (citation omitted). As discussed above, Brown's testimony was properly admissible as intrinsic evidence, and thus there was no error—much less plain error—in its admission.

## B. Uncharged Tax Returns and Tax-Refund Checks

Wilson also contends the district court erred in allowing the government to introduce evidence of 31 uncharged tax-refund checks amounting to almost $320,000 that were deposited into Wilson's Hancock Bank account, together with the associated tax returns, IRS transcripts, and Treasury check records. Because Wilson properly preserved his objection at trial, we review the district court's decision for an abuse of discretion. *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1328 (11th Cir. 2012) ("The district court's decision admitting or excluding evidence is a

---

[3] Wilson argues Brown's testimony only related to events through January or February of 2012, which is not sufficiently linked in time and circumstances. Brown, however, testified he last saw Wilson in June 2012. Thus, a jury could reasonably infer their dealings with each other continued through June 2012. Wilson opened his Hancock Bank account and began depositing the tax-refund checks at the end of June 2012.

26

discretionary call; a judge commits no reversible error unless his decision constituted an abuse of discretion."). Under an abuse of discretion review, the district court's determination "cannot be overturned unless [it is] 'manifestly erroneous.'" *Id.* at 1329 (citation omitted). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes finding of fact that are clearly erroneous." *Id.*

The district court did not abuse its discretion. Indeed, the court properly admitted the Hancock Bank account records related to the uncharged tax-refund checks as intrinsic to the charged crimes. The records were clearly linked in time and circumstances with the charged crimes, as Wilson deposited all of the checks in his Hancock Bank account between June and September 2012. Moreover, the checks arose out of the same series of transactions as the charged offenses and exhibited the same fraudulent indicators as the checks in the charged counts. Thus, the district court properly admitted all of the Hancock Bank transactions as intrinsic to the charged crimes.[4]

---

[4] The district court alternatively ruled that the Hancock Bank records were admissible pursuant to Rule 404(b). Even if it was error to admit the uncharged tax returns and refund checks evidence as intrinsic, the evidence would be admissible under Rule 404(b): it was relevant to show Wilson's knowledge and intent and to counter his claim that he was a legitimate check casher; it was sufficient to show that Wilson committed the acts, and the probative value of the evidence was not substantially outweighed by undue prejudice. The limiting jury instruction at the end of trial also minimized the risk of prejudice. Despite Wilson's argument to the contrary, no reversible error resulted from the district court not giving the limiting jury instruction at the time the evidence was

27

Wilson contends the district court abused its discretion in admitting the government's Bulk Exhibits 1, 2, 3, and 4 containing all of the tax returns, IRS transcripts, refund checks, and U.S. Treasury check records because the exhibits did not comport with the government's representations as to their content. Indeed, the government admits it incorrectly represented that Exhibits 1A-J, 2A-J, 3A-J, and 4A-J related to the six charged counts when in fact, only Exhibits A-F related to the charged refund checks; exhibits G-J did not. The government also included two refund checks for JoshR and HopeF without any corresponding tax returns. However, at trial, Wilson neither objected to the admission of these exhibits on the grounds that they did not comport with the government's representations as to their content nor explored these discrepancies in his cross examination of Agent Daley.

A "defendant is entitled to a fair trial; not a perfect one." *United States v. Rodriguez*, 503 F.2d 1370, 1371 (5th Cir. 1974) (citing *Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953)). Evidentiary rulings provide no basis for relief unless "there is a reasonable likelihood they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Schlei*, 122 F.3d 944, 980 (11th Cir. 1997) (internal

admitted during trial. *See United States v. Sterling*, 738 F.3d 228, 239 (11th Cir. 2013) (finding any error to be harmless when limiting instruction given at end of trial).

28

quotation and citation omitted). Wilson has failed to show a reasonable likelihood that any of the discrepancies in evidence affected his substantial rights. Indeed, none of the discrepancies even involved the charged counts.

### C. IRS Agent Daley's Testimony

Wilson contends the district court erred in allowing IRS Agent Daley to testify that all 37 of the tax returns associated with the Hancock Bank account checks were "fraudulent." We review this claimed error for an abuse of discretion.

We find no error here. Agent Daley relied on the original tax returns that caused the refunds to be issued, the backs of the canceled refund checks, and the lack of Form-1099s from the banks that had purportedly paid the interest claimed on the returns to properly support his conclusion that the tax returns were fraudulent. He described various patterns of fraud including checks having identical refund amounts and individuals claiming large amounts of interest in whole dollar amounts. Thus, the district court properly admitted and let the jury weigh Daley's opinion that all of the tax returns were fraudulent.

### D. Text Messages from Wilson's Former Attorney to IRS Agent

Wilson also contends the district court erred in admitting his former attorney's text messages for two reasons: (1) the messages were improperly admitted as non-hearsay under Federal Rule of Evidence 801(d)(2)(D) as statements offered

29

against Wilson and made by Wilson's agent on a matter within the scope of that relationship while it existed; and (2) the admission of the messages violated the Confrontation Clause. We disagree.

The district court did not abuse its discretion. Rule 801(d)(2)(D) provides that a statement is not hearsay if the "statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Wilson contends that the district court erred because it did not give proper deference to the attorney-client relationship. The district court, however, carefully considered the admission of the text messages and its resulting impact on the attorney-client relationship. The district court observed that the context of the statements did not suggest any attorney-client privilege because the attorney was texting with Agent Daley.

Wilson also contends that the admission of the text messages violated the Confrontation Clause. We review "a preserved Confrontation Clause claim *de novo*," *United States v. Curbelo*, 726 F.3d 1260, 1271-72 (11th Cir. 2013), and also review *de novo* "the question of whether hearsay statements are testimonial for purposes of the Confrontation Clause." *United States v. Caraballo*, 595 F.3d 1214, 1226 (11th Cir. 2010) (internal quotation and citation omitted).

30

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. The Confrontation Clause "bars the admission of the testimonial statements of a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity to cross-examine him or her." *Id.* at 1227. (citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1360, 158 L.Ed. 2d 177 (2004)). The Confrontation Clause is concerned with "testimonial statements made out of court by a declarant whom the defendant has a constitutional right to confront through cross-examination." *United States v. Charles*, 722 F.3d 1319, 1322 (11th Cir. 2013).

The central issue here is whether the attorney's text messages are testimonial. Testimonial statements are ones "that declarants would reasonably expect to be used prosecutorially." *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364. Certain statements "by their nature [are] not testimonial—for example, business records or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367. Testimony is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Charles*, 722 F.3d at 1322 (internal quotation and citation omitted). This Court has explained that,

> formal statements to government officers are generally testimonial as
> are affidavits, custodial examinations, prior testimony that the defendant

31

was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially. Similarly, extrajudicial statements contained in formalized testimonial material, such as affidavits, depositions, prior testimony, or confessions, and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, fall within the core class of testimony. *Caraballo*, 595 F.3d at 1228.

Here, the attorney communicated through informal text messages to coordinate the delivery of the boxes. The cooperative and informal nature of those text messages was such that an objective witness "would [not] reasonably expect [the texts] to be used prosecutorially." *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364 (internal quotation marks omitted). We find the text messages were non-testimonial and properly admitted. *See United States v. Mathis*, 767 F.3d 1264 (11th Cir. 2014) (text messages were non-testimonial, and therefore their admission did not violate defendant's rights under the Confrontation Clause, as the text messages were informal, haphazard communications rather than formal statement to government officers or statements made during a custodial examination).

## III.    Sentencing Issues

Following Wilson's trial, the district court imposed a total sentence of 102 months' imprisonment, consisting of 78 months each as to Counts 1-3, 5, 6, and 13, all to run concurrently with each other; 12 months as to Count 4, to run concurrently with the 78-month term; 24 months each as to Counts 7-9, 11, and 12, to run

32

concurrently with each other, but consecutively to the sentences for the other counts; and 60 months for Count 14, to run concurrently with the sentences for Counts 1-3, 5,6, and 13.

After considering the evidence presented at trial and at sentencing, the district court determined: (1) Wilson's conduct involved over $400,000 in losses and thus applied a 14-point offense level increase in accordance with section 2B1.1(a)(2) of the Sentencing Guidelines, and (2) his conduct involved over 50 victims and thus applied a 4-point increase in accordance with section 2B1.1(b)(2) of the Sentencing Guidelines.

Wilson argues the district court erred by including uncharged tax-refund checks in its loss calculation and considering each name as a victim on the charged and uncharged checks. This Court reviews the district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts with "due deference," *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136-37 (11th Cir. 2004) which is "tantamount to clear error review."[5] *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010). For a finding to be clearly erroneous, the Eleventh Circuit "must be left with a definite and firm conviction that a mistake has been committed." *Id.* at 624. A factual finding cannot be clearly erroneous when the

---

[5] We reject the government's contention that the standard of review is plain error and invited error. Not only did Wilson's attorney object to the amount of loss and number of victims, but Wilson himself also objected in a letter the district court considered.

33

factfinder is choosing between two permissible views of evidence. *United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010).

We find no error. At sentencing, the district court may take into account conduct for which the defendant was not charged or convicted, so long as the government proves such conduct by a preponderance of the evidence. *See United States v. Exarhos*, 135 F.3d 723, 7130 (11th Cir. 1998) (conduct not contained in the indictment may be considered at sentencing); *United States v. Barakat*, 130 F.3d 1448, 1452 (11th Cir. 1997) (conduct for which the defendant was acquitted may be considered at sentencing). For sections like § 2B1.1 that determine the defendant's offense level largely based on the total amount of loss or some other measure of aggregate harm, the Sentencing Guidelines instruct the court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that were part of the "same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(A) and (a)(2); *see also* 3D1.2(d). The district court's loss calculation need not be made with precision and may be properly based on a reasonable estimate given the information available. *Cabrera*, 172 F.3d at 1292. However, when the defendant challenges the calculation, the government bears the burden of supporting it with reliable and specific evidence. *Id.*

34

Here, the district court properly included the uncharged conduct in its calculations. The undisputed facts in the PSI, and the evidence the government presented at trial and sentencing, sufficiently support the court's finding that the uncharged conduct was part of a common scheme and relevant for sentencing purposes. Agent Daley's testimony at trial and sentencing established that Wilson deposited 52 tax-refund checks into three bank accounts registered in the name of Wilson's bail bonds business. Daley testified the tax returns that caused these 52 checks to be issued were all fraudulent.

We reject Wilson's contention that the government failed to present sufficient evidence to support the conclusion that the uncharged refund checks were fraudulent. Daley testified he discerned a pattern in the way the tax returns were filed indicating fraudulence. The checks were in large amounts and for whole dollar amounts. Wilson used the money deposited from these checks almost exclusively for personal matters, not for his bail bonds or check-cashing businesses. And many of the payees were deceased. Wilson's contention on appeal that the government's exhibits were inconsistent with the prosecutor's discussion of them at trial is unavailing, as the evidence amply supported the district court's loss and victim calculations.

Wilson also contends for the first time on appeal that the government failed to prove that the names on all of the checks were associated with real people. We review

35

objections raised on appeal that were not timely raised in the district court for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). The district court committed no error, plain or otherwise. We have explained that 18 U.S.C. § 1028A(a)(1) criminalizes the use of a real person's identity. *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1225 (11th Cir. 2012). This Circuit has held that district courts may infer, based on common sense, that the IRS would not issue a tax-refund check for a fictitious person. *See United States v. Philidor*, 717 F.3d 883, 885-86 (11th Cir. 2013). Thus, the district court reasonably inferred that the 52 names identified real people in its calculation of the number of victims at sentencing.

Based on the foregoing, we find no reversible error. Accordingly, Wilson's convictions and sentence are AFFIRMED.

36