[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11269

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

IRVING CEPEDA-CHICO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cr-00217-GAP-LRH-1

_____

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Irving Cepeda-Chico appeals his 168-month sentence after pleading guilty to one count of conspiring to distribute and possess with intent to distribute fentanyl and twelve counts of distributing and possessing with intent to distribute heroin and fentanyl. He argues on appeal that: (1) there was insufficient evidence to support the district court's upward departure under U.S.S.G. § 5K2.1; (2) the district court failed to state sufficient reasons for its departure, as required by 18 U.S.C. § 3553(c)(2); and (3) his sentence is procedurally and substantively unreasonable. After review, we affirm.

## I.    Background

In October 2019, Cepeda-Chico was charged with one count of distributing a controlled substance containing a detectable amount of fentanyl, which resulted in the death of M.D. on July 19, 2019. Thereafter, the government filed a superseding indictment that did not contain the initial charge, but instead contained 13 counts—one for conspiracy to distribute and possess with intent to distribute fentanyl and twelve for distributing and possessing with intent to distribute heroin. Cepeda-Chico pleaded guilty to all thirteen counts, pursuant to a written plea agreement. According to the factual basis in the plea agreement, between December 2018 and July 2019, Cepeda-Chico purchased heroin and fentanyl-laced

heroin from a supplier in Mexico and distributed the drugs to various individuals in Florida, including an undercover informant and a man named M.D.  In late June 2019, police recorded a call in which Cepeda-Chico spoke with his Mexican-based drug supplier and told him that the batch of heroin he received from the supplier "was not good and was burning his customers in their veins." Cepeda-Chico and his supplier arranged for an unnamed buyer to buy the rest of Cepeda-Chico's bad batch.

On July 18, 2019, Cepeda-Chico met with M.D. and sold him heroin.  M.D. checked into the hospital later that same day for a chronic condition, and he died overnight from ingesting a mixture of fentanyl and heroin.  Two bags of drugs were discovered on the scene, one of which contained 3.76 grams of a mixture of fentanyl and heroin and the other contained about half a gram of pure heroin.

Upon Cepeda-Chico's arrest, he turned over several baggies of drugs to the police—one contained 198.8 grams of fentanyl-heroin, another 33.64 grams of heroin, and another 99.8 grams of fentanyl-heroin.

Cepeda-Chico's resulting guidelines range was 120 months' imprisonment—the statutory mandatory minimum.  He faced a statutory maximum term of life.  The United States Probation Office identified M.D.'s death as a potential ground for departure under U.S.S.G. § 5K2.1.

The government filed a motion for an eight-level upward departure under U.S.S.G. § 5K2.1, arguing that Cepeda-Chico engaged in the prolonged, wide-spread distribution of fentanyl-laced heroin, in disregard of the known dangers from fentanyl, which resulted in M.D.'s death. Cepeda-Chico opposed the motion, arguing that the government could not meet its burden to prove by a preponderance of the evidence that he supplied the drugs that resulted in M.D.'s death. He asserted that M.D. had a life-long history of intravenous drug abuse that was so bad that his forearm was disfigured due to a bone infection. He maintained that M.D. procured drugs wherever he could get them, and that there was no direct evidence linking Cepeda-Chico to the drugs that killed M.D. Cepeda-Chico requested a 120-month sentence.

At sentencing, in support of its motion for an upward departure, the government called several witnesses. Christopher DeLotte, the Drug Enforcement Agency (DEA) case agent, testified that he monitored Cepeda-Chico's phone from June 20, 2019 through August 6, 2019. In late June, Cepeda-Chico contacted his drug supplier in Mexico because the drugs were burning customers' veins. The two discussed mixing fentanyl with the heroin to try and fix the problem. Cepeda-Chico told his supplier that if something went wrong, he was "screwed."

During one of the monitored calls, Cepeda-Chico arranged to sell five grams of heroin to M.D., and law enforcement arrested

M.D. during a traffic stop following the transaction on June 21, 2019.

M.D. was released from jail on the night of July 17, 2019, into the custody of his mother. The next day, M.D.'s mother drove him to meet Cepeda-Chico at a Walgreens because he stated that he owed Cepeda-Chico money for the June purchase of drugs. Surveillance footage from the Walgreens showed M.D. meeting with Cepeda-Chico inside Cepeda-Chico's vehicle. Cepeda-Chico admitted to law enforcement that he sold 3 grams of heroin to M.D. at the Walgreens and that M.D. was his best customer. Cepeda-Chico told law enforcement that he received a call from M.D. later that evening, and M.D. told him that the heroin was "garbage."

On July 19, 2019, DeLotte learned that M.D. died of a drug overdose while in the hospital for a chronic condition. In M.D.'s hospital room, police found two bags of drugs—one containing just heroin and one containing a mixture of heroin and fentanyl, a spoon, and a syringe containing heroin and fentanyl.

On cross-examination, DeLotte testified that M.D.'s mother told him that M.D. would also sometimes buy drugs while in Las Vegas. He extracted data from M.D.'s phone, but he did not recall finding information suggesting that M.D. bought heroin from anyone other than Cepeda-Chico. M.D.'s mother picked up M.D. from jail, took M.D. to the hospital, and stated that M.D. was with her the entire time. Based on Cepeda-Chico's statement that he sold heroin to M.D. just prior to M.D.'s overdose, DeLotte

believed that the drug's Cepeda-Chico sold to M.D. resulted in M.D.'s death. DeLotte confirmed that M.D. was facing a mandatory-minimum sentence for the drug charge stemming from his June arrest, and he had told his mother he was not going to go back to jail.

Testimony was presented that DNA testing on the baggies of drugs discovered in M.D.'s hospital room revealed two DNA profiles—98% from M.D. and 2% from an unknown contributor— and that Cepeda-Chico was excluded as a contributor. The laboratory analyst confirmed that individuals do not necessarily leave DNA on every surface they touch, and an individual's DNA could appear on an object they have not touched through "secondary transfer" if that individual interacted with someone who later touched that object.

Dr. Marie Hansen, the medical examiner for M.D.'s case, testified that M.D.'s death was the result of "[t]he combined toxicity of fentanyl and heroin." M.D. had a "very small amount of heroin" present in his system, and "more than three times the amount [of fentanyl] that you would expect to put somebody under for surgery." M.D. was given a therapeutic dose of morphine at midnight by hospital staff, but Dr. Hansen did not believe it contributed to M.D.'s death. Dr. Hansen opined that M.D. most likely would not have died without the fentanyl.

Claudia Beache, M.D.'s mother, testified that M.D. had used drugs for over 20 years, and Cepeda-Chico was his main source of drugs because he felt confident in the heroin that Cepeda-Chico

21-11269                Opinion of the Court                7

sold him. She sometimes drove M.D. to these drug transactions because she did not feel it was safe for him to drive. She picked M.D. up outside the jail on the evening of June 17, 2019, they returned home, he slept most of the next morning and then helped her with a few chores, and they left the afternoon of June 18, 2019, to go to the hospital. She confirmed that he never left the home before they left for the hospital. Before they went to the hospital, M.D. had her take him to an ATM because he stated he owed money to Cepeda-Chico for the drugs he bought in June, and they met Cepeda-Chico at a Walgreens. After meeting with Cepeda-Chico and picking up food at a nearby fast-food restaurant, they went to the hospital, M.D. was admitted, and Beache left the hospital shortly before 10:00 p.m. On cross-examination, she confirmed that M.D. was facing a possible three-year mandatory-minimum sentence for his June arrest, and M.D. told her that he did not want to go back to jail.

M.D.'s sister testified that she talked with him about fentanyl issues, but that he stated that he was not concerned because he knew the product that he was getting from Cepeda-Chico. After M.D.'s death, she found an unread text from Cepeda-Chico asking if M.D. was "ready for another batch," but she deleted Cepeda-Chico's text because she did not want her mother to see it.

Following the government's witnesses, Cepeda-Chico's counsel argued that an upward departure was not appropriate because the government had not proved by a preponderance of the

evidence that the drugs Cepeda-Chico sold M.D. were the drugs that killed him.  He pointed out that two baggies of drugs were found in M.D.'s hospital room, and argued that Cepeda-Chico gave M.D. the one with pure heroin, not the one with the mixture of fentanyl and heroin that killed M.D.  He also emphasized that Cepeda-Chico's DNA was not found on either of the baggies.

With regard to the 18 U.S.C. § 3553(a) sentencing factors, Cepeda-Chico's counsel emphasized that Cepeda-Chico grew up in a small, poor town in Puerto-Rico and was raised primarily by his mother.  Cepeda-Chico had two young children and was going to miss their formative years.  Counsel emphasized that Cepeda-Chico cooperated with law enforcement as soon as he was arrested, was very remorseful, and was not a danger to the public. Counsel argued that M.D. "knew what he was doing" and did not intend to go back to jail, and that Cepeda-Chico should not be held responsible for M.D.'s choice.

The government argued that Cepeda-Chico distributed large quantities of drugs for a living, and he had to be held accountable for that as well as for what happened to M.D.  The government emphasized Cepeda-Chico's conversations with his supplier about the bad batch of heroin and that they discussed mixing fentanyl with it.  The government argued that an eight-level upward departure was warranted because it reflected the offense level that Cepeda-Chico would have received had he been convicted of distributing drugs containing fentanyl, which resulted in the death of another.  The district court recessed so that it could

consider all the evidence and allowed the parties to submit supplemental briefs.

Approximately six weeks later, the sentencing hearing resumed. The district court explained that it had reviewed the transcripts, exhibits, and filings by the parties, and it found "that the illegal substance sold by the defendant to Mr. Dozier on July 18th was the cause of his death," but determined that the eight-level upward departure requested by the government was not appropriate. Rather, it concluded that a six-level upward departure was appropriate under the circumstances because "Cepeda-Chico did sell a substance containing fentanyl, which led to the death of a human being, and that is definitely a game changer when it comes to drug sentencing." With the upward departure, Cepeda-Chico's new guidelines range was 168 to 210 months' imprisonment. The district court noted that it considered the § 3553(a) factors and imposed a sentence of 168 months' imprisonment, followed by five years of supervised release. Cepeda-Chico stated he had no objections to the sentence or the manner in which it was pronounced. Cepeda-Chico timely appealed.

## II.    Discussion

### A. Whether the district court erred in applying the U.S.S.G. § 5K2.1 and upwardly departing from the guidelines range

Cepeda-Chico argues that the there was insufficient evidence to support the U.S.S.G. § 5K2.1 enhancement, and the district court clearly erred in finding that Cepeda-Chico supplied

the drugs that killed M.D.  He maintains that he only sold M.D. one bag of pure heroin on July 18, 2019, and that the government failed to present any direct evidence that linked him with the bag of the fentanyl-heroin mixture, noting that it had DNA from an unknown individual on it.  He also asserts that testimony established that he sold M.D. pure heroin in the past, and that M.D. sometimes bought drugs elsewhere when he was out of town.  He argues that only mere speculation supports the district court's finding that he sold M.D. the drugs that resulted in his death.

We review the district court's interpretation and application of the Sentencing Guidelines *de novo* and its factual findings for clear error.  *United States v. Little*, 864 F.3d 1283, 1290 (11th Cir. 2017).  We review the district court's decision to grant an upward departure for an abuse of discretion.  *United States v. Flanders*, 752 F.3d 1317, 1341 (11th Cir. 2014).  "For a factual finding to be clearly erroneous, this Court, after reviewing all the evidence, must be left with a definite and firm conviction that a mistake has been committed."  *Little*, 864 F.3d at 1290 (quotation omitted).  A factual finding cannot be clearly erroneous where the district court chooses between two permissible views of the evidence.  *United States v. Wilson*, 788 F.3d 1298, 1317 (11th Cir. 2015).

The sentencing guidelines provide that the district court may depart from the guidelines range for certain reasons, including if death resulted from the defendant's conduct.  U.S.S.G. §§ 5K2.0, 5K2.1.  Among other things, the extent of the departure depends "on the dangerousness of the defendant's conduct, the extent to

which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury." *Id.* § 5K2.1.

The district court's finding that Cepeda-Chico sold M.D. the drugs that resulted in M.D.'s death was not clearly erroneous. The evidence presented at sentencing indicated that between M.D.'s release from jail late on the evening of July 17, 2019, and his admission to the hospital on the evening of July 18, 2019, he was with his mother the entire time, and his mother drove him to meet with Cepeda-Chico on the afternoon of July 18. Cepeda-Chico admitted that he sold heroin to M.D. that day. A few hours later, M.D. overdosed in the bathroom of his hospital room in the early morning hours of July 19. And Cepeda-Chico had conversations in late June 2019 with his drug supplier about mixing fentanyl with a batch of heroin to prevent it from burning customers' veins. Based on the totality of the evidence, the district court could have reasonably inferred that Cepeda-Chico sold M.D. the drugs that resulted in his death.

The lack of Cepeda-Chico's touch DNA on the baggies of drugs found with M.D. and the presence of a very small amount of touch DNA from an unknown person on the baggies does not necessarily undermine the conclusion that Cepeda-Chico sold M.D. the drugs in question. The laboratory technician testified that a person does not always leave DNA when he touches an item and that there is a possibility of secondary touch DNA transfer.

The evidence was therefore sufficient to meet the government's burden to prove by a preponderance of the evidence that M.D.'s death resulted from an overdose of the drugs he purchased from Cepeda-Chico.[1]  Accordingly, the district court did not abuse its discretion in applying § 5K2.1 and upwardly departing from the guidelines range.

### B. Whether the district court sufficiently stated its reasons for the upward departure

Cepeda-Chico argues that the district court failed to provide specific reasons in open court for the upward departure, in violation of 18 U.S.C. 3553(c)(2).

If a district court departs from the guidelines range, it must state in open court at sentencing and in a statement of reasons form "the specific reason for the imposition of a sentence" outside the guidelines range.    18 U.S.C. § 3553(c)(2); U.S.S.G. § 5K2.0(e). "[T]he district court's reasons must be sufficiently specific so that an appellate court can engage in the meaningful review envisioned by the Sentencing Guidelines." *United States v. Parks*, 823 F.3d 990, 997 (11th Cir. 2016) (quotation omitted).  In other words, the district court must "answer the key question of why [it] imposed an above-guideline sentence." *Id.* "If the court does not do this,

---

[1] Although there may have been a permissible view of the evidence that supports Cepeda-Chico's position, a factual finding is not clearly erroneous where the district court chooses between two permissible views of the evidence. *Wilson*, 788 F.3d at 1317.

the case must be remanded for resentencing." *Id.* at 997 (quotation omitted). We review *de novo* whether the district court complied with § 3553(c)(2), even if the defendant failed to object below. *Id.* at 996–97.

Here, the district court stated in open court and on the statement of reasons form "the specific reason for the imposition of a sentence"—namely, that Cepeda-Chico sold M.D. the drugs that resulted in M.D.'s death. *See* 18 U.S.C. § 3553(c)(2). That explanation was sufficient to enable us to engage in meaningful appellate review of the upward departure. *See United States v. Delvecchio*, 920 F.2d 810, 813 (11th Cir. 1991) (explaining that the district court must provide a statement of reasons under § 3553(c)(2) "so that the reviewing court can determine whether the departure was justified"). Although Cepeda-Chico argues that the district court should have expounded on its reasoning further and explained in detail the factors it considered, we do not expect a district court "to articulate [its] findings and reasoning with great detail." *United States v. Irey*, 612 F.3d 1160, 1195 (11th Cir. 2010) (*en banc*). Because the district court provided the specific reason for the departure and we were able to conduct meaningful review of its decision, there was no error.

C. *Whether Cepeda-Chico's sentence is procedurally and substantively reasonable*

Cepeda-Chico argues that the district court imposed a procedurally unreasonable sentence because its "rote recitation" that it considered the 18 U.S.C. § 3553(a) factors was insufficient to

show that it actually considered the § 3553(a) factors.  He also argues that his sentence is substantively unreasonable because the district court did not consider mitigating aspects of his background and the offense conduct, such as his post-arrest cooperation and favorable letters from friends.

Generally, we review a sentence for both procedural and substantive reasonableness under a deferential abuse of discretion standard.  *See Gall v. United States*, 552 U.S. 38, 51 (2007).  A sentence can be procedurally unreasonable if the district court "fail[s] to consider the § 3553(a) factors."  *Id.*  However, where as here, the defendant did not object to the procedural reasonableness of his sentence, we review his procedural reasonableness challenge for plain error.  *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014).[2]

To establish plain error, Cepeda-Chico must show "(1) that the district court erred; (2) that the error was plain; and (3) that the

---

[2] In *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766–67 (2020), the Supreme Court held that where a defendant advocates for a particular sentence in the district court, he preserves a challenge to the substantive reasonableness of his sentence.  However, the Supreme Court expressly declined to address what is sufficient to preserve a procedural challenge.  *Id.* at 767; *see also id.* at 767 ("[W]e do not decide what is sufficient to preserve a claim that a trial court used improper *procedures* in arriving at a chosen sentence. . . .  Nevertheless, as we have previously explained, failing to object at all to a procedural error . . . will subject a procedural challenge to plain-error review." (quotation omitted) (Alito, J., concurring)).  Therefore, *Vandergrift* remains good law.

error affected his substantial rights.  If all three conditions are met, we then decide whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (alterations adopted) (quotations and internal citations omitted). He bears the burden of showing that the sentence is procedurally unreasonable. *United States v. Hill*, 783 F.3d 842, 844 (11th Cir. 2015).

We examine whether a sentence is substantively reasonable in light of the totality of the circumstances.  *Gall*, 552 U.S. at 51. The district court must issue a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553(a)(2), which include the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct. 18 U.S.C. § 3553(a).  The court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant."  *Id.* § 3553(a)(1). "[T]he district court need only 'acknowledge' that it considered the § 3553(a) factors, and need *not* discuss each of these factors . . . ." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007) (quotation and internal citation omitted).  Importantly, the weight given to a particular § 3353(a) factor "is committed to the sound discretion of the district court," and it is not required to give "equal weight" to the § 3553(a) factors.  *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation omitted).

The burden rests on the party challenging the sentence to show "that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *Id.* at 1256. We will "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (*en banc*) (quotation omitted).

Cepeda-Chico cannot show that any procedural error occurred, much less a plain error. In imposing Cepeda-Chico's sentence, the district court stated that it had reviewed the parties' filings, the PSI, the evidence presented at the sentencing hearing, and the § 3553(a) factors. The district court was not required to discuss each factor. *Amedeo*, 487 F.3d at 833; *see also Irey*, 612 F.3d at 1195 (*en banc*). Instead, "an acknowledgement that the district court has considered the defendant's arguments and the § 3553(a) factors [is sufficient]." *United States v. Taylor*, 997 F.3d 1348, 1354–55 (11th Cir. 2021) (alterations adopted) (quotation omitted).

Similarly, Cepeda-Chico cannot show that the district court abused its discretion in imposing a substantively unreasonable sentence. Although he quarrels with how the district court weighed the relevant factors, the weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court. *Rosales-Bruno*, 789 F.3d at 1254 (quotation omitted). The district court was entitled to give more weight to

the nature and circumstances of the offense and M.D.'s death over Cepeda-Chico's mitigating circumstances. *See id.* at 1256. Moreover, his total 168-month sentence is well below the statutory maximum life, which is an indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that a sentence that is below the statutory maximum is another indicator of reasonableness).

Accordingly, we conclude that Cepeda-Chico's total 168-month sentence is both procedurally and substantively reasonable, and we affirm.

**AFFIRMED.**