[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14193
_____

D.C. Docket No: 8:14-cr-00217-VMC-EAJ-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MAHMOUD ALDISSI,
a.k.a. Matt,
ANASTASSIA BOGOMOLOVA,
a.k.a. Anastasia,

Defendants - Appellants.
_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(December 13, 2018)

Before JILL PRYOR, HULL, Circuit Judges, and PROCTOR,[*] District Judge.

PROCTOR, District Judge:

_____

   *  Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

In this appeal we are asked to decide a number of issues arising out of a trial in which Mahmoud Aldissi and Anastassia Bogomolova (collectively, for ease of reference "the Scientists" or "Defendants") were convicted of wire fraud. The Scientists have also raised issues related to their respective sentencings. The trial involved charges that Aldissi and Bogomolova submitted fraudulent scientific research proposals in order to obtain federal funds through competitive set-aside programs which Congress designed to enable eligible small businesses to research and commercialize new technology. Between 1997 and 2011, the Scientists obtained 44 Small Business Innovation Research ("SBIR") and Small Business Technology Program ("STTR") contracts or grants collectively worth approximately $10.5 million. They applied for an additional $13.8 million in contracts or grants, which they did not receive. When applying for the government set-aside programs, Defendants lied about their facilities, equipment, subcontractors, employees, and eligibility; forged endorsements from respected scientists and industry specialists; and thereafter submitted falsified business records to officials investigating the fraud. They admit that, under the terms of the bid requirements, they were not eligible for any of the contracts or grants for which they applied.

Nevertheless, Defendants argue that (1) the evidence introduced at trial was insufficient to convict them, (2) the district court committed errors at trial, and, further, (3) the district court also erred in sentencing them. After careful review, and

2

with the benefit of oral argument, we disagree in all respects and affirm both their respective convictions and sentences.

## I.    BACKGROUND

The trial below was lengthy and the record on appeal is expansive.  Before addressing the Defendants' arguments, we briefly discuss the procedural history, summarize relevant facts, and catalog the arguments raised by Defendants in this appeal.

### A.    Procedural History

Defendants are husband and wife.  After an 18-day trial, a jury found Defendants guilty of the following offenses: one charge of conspiracy to commit wire fraud under 18 U.S.C. § 1349 (Count One); seven charges of wire fraud under 18 U.S.C. § 1343 (Counts Two through Eight); five charges of aggravated identity theft under 18 U.S.C. § 1028A (Counts Nine through Thirteen); and two charges of falsification of records involving federal investigations under 18 U.S.C. § 1519 (Counts Fourteen and Fifteen).  The guideline imprisonment range for both Aldissi and Bogomolova was calculated to be 324 to 405 months.  (Aldissi PSR ¶ 126; Bogomolova PSR ¶ 128).  The district court sentenced Aldissi to serve a total of 180 months' imprisonment – *i.e.*, concurrent custodial terms of 156 months as to Counts One through Eight, Fourteen, and Fifteen, followed by a 24-month custodial term as to Count Nine, consecutive to Counts One through Eight, Fourteen and Fifteen, and

24 months on Counts Ten through Thirteen, concurrent to Count Nine. (Doc. #334; Doc. #337). The district court sentenced Bogomolova to serve a total of 156 months' imprisonment – *i.e.*, concurrent custodial terms of 132 months as to Counts One through Eight, Fourteen, and Fifteen, followed by 24-month custodial terms as to Count Nine, consecutive to Counts One through Eight, Fourteen and Fifteen; and 24 months on Counts Ten through Thirteen, concurrent to Count Nine. (Doc. #335; Doc. #339). Defendants were ordered to pay $10,654,969 in restitution. (Docs. #334, 335).

  B.    Summary of Relevant Facts

Congress established the SBIR and STTR programs to assist qualified small businesses with the expense of researching and developing innovative technology "in order to maintain and strengthen the competitive free enterprise system and the national economy." 15 U.S.C. § 638-(a). Under these programs, federal agencies with research-and-development budgets must set aside a percentage of those budgets to fund research by qualifying small businesses. (Doc. #378-2 at 139). The set-asides stimulate research and innovation and encourage private companies to commercialize research with an actual product or service. (Doc. #378-1 at 51; Doc. #378-2 at 101-05; Doc. #378-3 at 59). In fact, commercialization is the main goal. (Doc. #378-3 at 46, 59, 212; Doc. #378-6 at 141-42; Doc. #378-9 at 18-25).

4

As part of a highly competitive process, researchers electronically submit detailed proposals outlining their research and identifying material components of their proposals, including the principal investigator ("PI"), key employees, facilities, equipment, consultants, budget, profits, workplan, and other information. (Doc. #378-2 at 109, 116-18, 151; Doc. #378-3 at 60-61; Doc. #378-4 at 277; Doc. #378-6 at 122, 133-34, 141). The supporting federal agency screens all proposals and eliminates those that do not meet eligibility requirements. (Doc. #378-4 at 168, 209-11). Generally, a proposal is ineligible if the PI is not primarily employed (at least 51%) by the small business or is employed full-time elsewhere, or if the work will not be performed in the United States. (Doc. #378-2 at 109, 128-32, 141-42; Doc. #378-3 at 103; Doc. #378-4 at 168, 209-10; Doc. #378-6 at 25). The proposals are scored by a panel of experts and a winner is determined. (Doc. #378-4 at 168-69). The agency then incorporates the winning proposal into a contract, and a supervising reviewer monitors periodic reports submitted by the business and documents performance. (*Id.*). In submitting a proposal (and later, in requesting payment), each small business official certifies that the information in the proposal is true and acknowledges that submitting false information qualifies as a criminal offense. (Doc. #378-4 at 221; Doc. #378-5 at 8; Doc. #378-9 at 157-66; Doc. #378-11 at 138-39; Doc. #378-12 at 197-201).

5

The Scientists admit that their proposals were deceptive in several ways: (1) they forged letters of support using cut and paste methods and Photoshop; (2) they misrepresented their access to lab space (including facility and square footage) and equipment, and their physical address; (3) they falsely listed inflated price quotes from consultants and subcontractors they did not intend to use and, in fact, did not use; (4) they misrepresented Aldissi's eligibility to serve as PI; (5) they inflated their companies' number of employees; and (6) they mischaracterized their relationships with research institutions and commercial partners.  (Appellants' Brief at 11-12). These deceptions were admittedly material: that is, without them, the agencies would not have funded the Scientists' proposals.  (Doc. #378-3 at 61, 70; Doc. #378-5 at 10, 163-64, 193-94, 227, 243-44; Doc. #378-6 at 32, 42; Doc. #378-7 at 155-56, 166, 219-20; Doc. #378-8 at 128; Doc. #378-9 at 55).

## II.  STATEMENT OF THE ISSUES

Defendants raise several arguments on appeal.  The principal one is that there was insufficient evidence to convict them of wire fraud, conspiracy to commit wire fraud, aggravated identity theft, and falsification of records.  They also contend the district court abused its discretion by using a disjunctive jury charge and denying a motion for mistrial.  They claim the trial court erred when it failed to dismiss the aggravated identity theft charges against them and refused to strike the name "Mahmoud" from the Indictment.  They argue that during the trial the district court

should have reopened *Franks* and *Miranda* hearings.  Finally, they assert the district court clearly erred in calculating a guideline range and that their sentences were unreasonable under 18 U.S.C. § 3553(a).  We address each argument below.

## III.    DISCUSSION

### A.    The Guilt/Innocence Issues

We begin our discussion with an analysis of the guilt phase issues raised by Defendants.  They present a number of arguments.  Each is without merit.

#### 1.    Wire Fraud

The Scientists assert that there was insufficient evidence of wire fraud to convict them and that the district court erred in refusing to give a conjunctive wire fraud jury instruction.  We address each argument, in turn.

##### a.  Sufficiency of the Evidence

The Scientists' central argument on appeal is that the evidence against them is insufficient to support the guilty verdicts for wire fraud and conspiracy to commit wire fraud.  Defendants have not advanced any argument that there was no conspiracy.  Rather, they attack their conspiracy convictions on the same grounds as the substantive wire fraud convictions.  That is, they rely on the same arguments they have launched in challenging the jury's wire fraud verdicts.

We review *de novo* the sufficiency of the evidence supporting those verdicts, but view the evidence in the light most favorable to the United States.  *United States*

*v. Capers*, 708 F.3d 1286, 1296-97 (11th Cir. 2013); *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003). That means we are obliged to resolve any conflicts in favor of the government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict. *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006). And, we are guided by this polestar: evidence is sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996).

To prove wire fraud under 18 U.S.C. § 1343, the United States must establish that a defendant intentionally participated in a scheme or artifice to defraud and used the interstate wires to carry out that scheme. *United States v. Langford*, 647 F.3d 1309, 1320 (11th Cir. 2011); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Similarly, "to sustain a conviction for conspiracy to commit wire fraud, the government must prove that the defendant knew of and willfully joined in the unlawful scheme to defraud." *United States v. Rodriguez,* 732 F.3d 1299, 1303 (11th Cir. 2013) (internal quotation marks omitted). Here, the Scientists' argument centers on the "scheme to defraud" element as to both the substantive wire fraud and the conspiracy counts. Although the wire fraud statute does not define the phrase "scheme to defraud," we have held that there must be "proof of a material misrepresentation, or the omission or concealment of a material fact calculated to

8

deceive another out of money or property." *Maxwell*, 579 F.3d at 1299; *see also United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009). There is a difference between a scheme to defraud and a scheme to deceive. *United States v. Takhalov*, 827 F.3d 1307, 1312-13 (11th Cir. 2016). The phrase "scheme to defraud" is unique in that it refers "only to [a] scheme[] in which a defendant lies about the nature of the bargain itself." *Id.* at 1313. "That lie can take two primary forms: the defendant might lie about the price (*e.g.*, if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (*e.g.*, if he promises that a gemstone is a diamond when it is in fact a cubic zirconium). In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed [a scheme to defraud – that is, the defendant has engaged in] wire fraud." *Id.* at 1313-14. "But if a defendant lies about something else – *e.g.*, if he says that he is the long-lost cousin of a prospective buyer – then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone." *Id.* at 1314. Stated differently, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" *Id.* at 1314 (*quoting United States v. Shellef*, 507 F.3d 94, 108 (2d. Cir. 2007)).

9

The fundamental dispute here is whether the Scientists' admittedly material lies changed the nature of the bargain with the governmental agencies from whom they sought grants. Defendants concede that they forged letters of support; misrepresented their eligibility for funding; lied about their relationships with the research institutions and commercial partners, number of employees, facilities, their access to lab space and equipment; and fabricated price quotes from consultants and subcontractors that they never used or intended to use. Nevertheless, they maintain that the government received exactly what it paid for: license-free access to technical data. Defendants argue that they always intended to perform, and actually did fully perform, as evidenced by their research projects that were published in peer-reviewed scientific journals. They reason that because the SBIR and STTR programs were going to spend their money to fund research whether they submitted proposals or not, and because they performed (or, more precisely, contend they performed), the agencies were not subjected to a "scheme to defraud." However, this argument is without merit. Indeed, it is at odds with our *Maxwell* decision.[1]

In *Maxwell*, the defendant participated in a fraudulent scheme to obtain construction contracts which were set aside for socially and economically

---

[1] Defendants' alternative argument is that because the United States had to make awards consistent with the programs at issue, the awarded money is not "property" within the meaning of the wire-fraud statute. Because this case falls squarely within the four corners of *Maxwell*, we need not reach the question of whether the awarded money is property in the hands of SBIR and STTR.

disadvantaged companies. 579 F.3d at 1287. Although the defendant was not eligible to be awarded the contracts, in order to appear eligible, he made false representations that small businesses would operate with him as disadvantaged partners and perform commercially useful functions on those contracts. *Id.* at 1290. Against this backdrop, the defendant in *Maxwell* argued that he did not commit wire fraud "because, in the end, the County and the United States received the electrical work they sought." *Id.* at 1302. We flatly rejected that argument, finding that the issue of "financial loss is not at the core of these mail and wire frauds." *Id.* Through the scheme, construction contracts were awarded to ineligible companies. *Id.* "The County and the United States were free to prescribe the rules of this contracting process, and the defendant was not free to dishonestly circumvent the worthy purpose of the set-aside programs." *Id.* at 1303.

Like the set-aside programs in *Maxwell*, the SBIR and STTR programs at issue here exist for important social and economic purposes. Those programs "enable" small businesses to "undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy." 15 U.S.C. § 638(a). These are not job programs for unemployed scientists and do not fund research merely for the sake of research. Rather, the programs' primary purpose is to stimulate small businesses in the United States to commercialize research and market products. Because the Scientists' lies,

11

forgeries, and fabricated price quotes related to key ingredients for commercialization, those deceptions "dishonestly circumvent[ed] the worthy purpose of the … programs." *Maxwell*, 579 F.3d at 1303. Further, the deceptions deprived the United States not only of the money that should have been awarded to other researchers, but also of what it was actually paying for – the chance for eligible small businesses to commercialize their research and bring an actual product or service to the market. *Takhalov*, 827 F.3d at 1314 (citing *Shellef*, 507 F.3d at 108). To be sure, the deception occurred the moment the Scientists submitted false applications for the grants to which they were not entitled. By submitting applications which were replete with falsities, the Scientists defeated the entire purpose of the programs – *i.e.*, to foster small business and research projects that satisfy the programs' requirements and objectives for commercial promise.

This reasoning applies equally to both Scientists, even though Bogomolova argues there is insufficient circumstantial evidence to establish her knowledge of fabricated proposals. We note that contrary to her suggestion, the United States was not required to offer direct proof of her intent to defraud; indeed, inferences raised from that evidence (and the reasonable circumstantial evidence) are enough to support the jury's findings and verdict against her. *United States v. Munoz*, 430 F.3d 1357, 1369 (11th Cir. 2005). Although Bogomolova contends that she did not prepare the non-scientific parts of the proposals, the evidence adduced at trial

12

revealed that she submitted the same proposals containing the same fabrications about facilities, equipment, and personnel as Aldissi. The jury also heard evidence that Bogomolova submitted SBIR proposals claiming to have several research personnel, a fully equipped, 2500-square-foot laboratory in Belleair Beach with access to advanced equipment at other institutions, and the support of highly renowned scientists. When investigated by compliance officers, Bogomolova created and falsified a joint-venture agreement, an employment contract, and various time sheets. A reasonable jury could conclude that these facts were sufficient to show that Bogomolova actively participated in the scheme to defraud.[2] *Langford*, 647 F.3d at 1319-20; *United States v. Henry*, 920 F.2d 875, 877 (11th Cir. 1991) ("We … note that [an element of the crime] may be established, like most other facts, by circumstantial evidence, even if the jury might draw other reasonable inferences from the circumstantial evidence.") (internal quotation marks omitted).

b.  The Refusal to Give a Conjunctive Wire Fraud Jury Instruction

Next, the Scientists argue that the district court abused its discretion when it refused to give a conjunctive wire fraud jury instruction. A district court's refusal to give a proposed jury instruction is reviewed for abuse of discretion. *United States*

---

[2] A reasonable jury could also find Bogomolova guilty of fraud if there was sufficient evidence that she aided or abetted in the commission of a fraud, even if she did not personally commit all the facts constituting the fraud. *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015).

*v. Ndiaye*, 434 F.3d 1270, 1280 (11th Cir. 2006).  A refusal to give a requested instruction is an abuse of discretion if (1) the instruction is correct, (2) the court did not address the substance of the instruction in its charge, and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense.  *Maxwell*, 579 F.3d at 1303; *United States v. Sirang*, 70 F.3d 588, 593 (11th Cir. 1995).  Having said that, under our caselaw, we will reverse a conviction based on a jury instruction only if we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th Cir. 1998).

The Scientists asked the trial court to instruct the jury that intent to defraud "is the specific intent to deceive or cheat the United States usually for personal gain by intending to cause a financial loss to the United States."  (Doc. #378-15 at 77-78).  According to the Scientists, this instruction would have dealt with the central issue at trial – whether the Scientists specifically intended their deceptions to harm the United States *and* that their deceptions did in fact harm the United States.  They cite *Takhalov* in support of their contention that the conjunctive instruction is legally correct.  "[I]f there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*."  827 F.3d at 1313 (emphasis in original).  The district court rejected the Scientists' argument and used the disjunctive wire fraud instruction, which permitted the jury to find specific intent to harm if the Scientists acted for

14

personal gain *or* to harm the United States because "financial loss is not at the core of" mail and wire fraud. *Maxwell*, 579 F.3d at 1302.

After careful review, we conclude the trial court did not abuse its discretion in failing to give the jury instruction sought by Defendants. The requested instruction would have run directly counter to the holding in *Maxwell*. (Doc. #378-14 at 295). We appreciate the Scientists' point that their defense theory was that they fully performed without the intent to injure, deceive, or deprive the United States of property.[3] (*Id.* at 298). But, their argument is incongruent with *Maxwell*. As we have already explained, *Maxwell*'s holding is that financial loss is not at the core of wire fraud. *Maxwell*, 517 F.3d at 1302 ("Instead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit."). The requested instruction would have done nothing to address the distinction between a scheme to defraud and a scheme to deceive. *Takhalov*, 827 F.3d at 1317 (discussing a jury instruction which addressed "what kind of deception could constitute wire fraud"). Because the Scientists' requested instruction

---

[3] Defendants have not shown that the failure to give their proposed jury instruction impaired their ability to present an effective defense. *Maxwell*, 579 F.3d at 1303. The court's instruction that a "scheme to defraud includes any plan or course of action intended to deceive or cheat the United States out of money or property by using false or fraudulent pretenses, representations, or promises" addressed the Scientists' defense – *i.e.*, that they fully performed and that the United States received the benefit of its bargain. (Doc. #378-15 at 218-19) (arguing that a scheme to defraud included a plan "intended to deceive or cheat the government out of money or property … by using false or fraudulent pretenses" and that Aldissi did not intend to cheat because the agencies "g[o]t what … they bargained for").

contained an incorrect statement of the law, the trial court did not abuse its discretion in declining to give it. Moreover, we note that the Scientists have not argued that the disjunctive jury instruction actually given by the district court (which is the Eleventh Circuit's pattern instruction) was an incorrect statement of the law. *Ndiaye*, 434 F.3d at 1292-93.

### 2. Aggravated Identity Theft

The Scientists present two grounds on appeal for overturning the aggravated identity theft verdicts. First, they contend that the district court erred in denying the motion to dismiss the charges on the ground that the aggravated identity theft statute is unconstitutionally vague. Alternatively, they maintain that even if the statute is not unconstitutionally vague, there is insufficient evidence to convict them of aggravated identity theft. We disagree with both their assertions.

The aggravated identity theft statute imposes criminal liability on anyone who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," such as "any name," "during and in relation to" wire fraud. 18 U.S.C. §§ 1028(a)(7), (d)(7), 1028A(a)(1), (c)(5); *see also United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011). The Scientists argue that the use of the phrase "any name" is unconstitutionally vague because it elevates simple name dropping to the level of aggravated identity theft. They further contend that one does not "use" a means of identification within the meaning of § 1028(a) by

signing a document in his own name falsely stating that another gave him the authority to do so.

A criminal statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair warning, or authorizes arbitrary and discriminatory enforcement." *United States v. Lebowitz*, 676 F.3d 1000, 1012 (11th Cir. 2012); *see also United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) (explaining that a criminal statute is void for vagueness where "one *could not reasonably understand* that his contemplated conduct is proscribed") (emphasis added). A challenge for vagueness will fail where a defendant's actions "clearly fall within the intended reach of the … statute." *United States v. McGarity*, 669 F.3d 1218, 1233-34 (11th Cir. 2012). In *United States v. Wilson*, 788 F.3d 1298, 1310-11 (11th Cir. 2015), we held that under the "plain and unambiguous" language in §1028(d)(7), "use of a name, alone or in conjunction with any other information, clearly constitutes a means of identification so long as the name could be combined with other information to identify a specific individual." As such, the statute does not criminalize name dropping, but it does prohibit the "use" of a means of identification, "without lawful authority" "during and in relation to" an enumerated felony. 18 U.S.C. §§ 1028(a)(7), 1028A(a)(1). For this reason, Defendants' argument that the aggravated identity theft statute is unconstitutionally vague fails.

17

Not only is the statute constitutionally sound, but there also was sufficient evidence to find that Defendants did more than "name drop" and were not authorized to act on behalf of those whose identities they used. *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007) (finding that substantial evidence exits if "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*"). Aldissi forged letters of endorsement from respected scientists and industry specialists. These forged documents not only bore the names of trusted professionals, but also misleadingly used their titles, letterhead, and signatures to exploit their reputations. Therefore, the proof at trial was sufficient to convict the Scientists of aggravated identity theft. *United States v. Holmes*, 595 F.3d 1255, 1258 (11th Cir. 2010) (evidence demonstrating the defendant had repeatedly submitted her false identity documents to governmental scrutiny and successfully used the identity documents to obtain a driver's license, identification card, line of credit, and passport was sufficient for a reasonable jury to find the defendant knew the documents belonged to a real person).

Bogomolova's individual arguments are also off the mark. Just as with the sufficiency of the evidence related to the scheme to defraud, her intent to engage in identity theft was established by circumstantial evidence. *United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010) (citing *Holmes*, 595 F.3d at 1258 (holding that the government can rely on circumstantial evidence about an offender's

18

misuse of a victim's identity to prove the offender knew the identity belonged to a real person)).  A rational trier of fact could have found beyond a reasonable doubt that Bogomolova knew about the forged letters, even if she did not work on the non-scientific aspects of those proposals.  By way of example, Bogomolova submitted a proposal to the EPA involving a sensor to detect anthrax and ricin toxins.  (Doc. #378-3 at 27).  Those proposals attached letters purportedly from the Scientific Director of the USF Center for Biological Defense, the Director of Ultrafast Systems, the President of Sensidyne, and the President of Defentect supporting her proposal.  (Doc. #378-3 at 31, 42-46).  In connection with a Phase II proposal of the same project, she attached four additional forged letters.  (Doc. #378-3 at 27, 32, 76-83, 89-101).  Even if she did not "work on" this part of the proposal, a jury could make a common-sense finding that Bogomolova was aware that forged letters of support were being used by her husband to shore up the proposals.  *Gomez-Castro*, 605 F.3d at 1249 (stating that "knowledge can be inferred reasonably based on ordinary human experience for which no special proof is required; a trier of fact can rely on common sense"); *see also United States v. Gaines*, 690 F.2d 849, 853-54 (11th Cir. 1982) (holding that a jury should not presume a defendant's knowledge of documents he or she signed, but juries are permitted to infer such knowledge).[4]

---

[4] *See United States v. Villegas*, 911 F.2d 623, 630 (11th Cir. 1990) (noting that a family relationship alone is not sufficient to prove knowledge); *United States v. Ritz*, 548 F.2d 510, 522

19

Therefore, there was sufficient evidence for a reasonable jury to convict Bogomolova of the aggravated identity theft charge.

### 3. Falsification of Evidence

Although the Scientists "knowingly" created a backdated joint venture agreement, employment contract, and timesheets "with the intent to impede, obstruct, or influence" a federal investigation, they argue that there is insufficient evidence to support the verdict on falsification of documents. 18 U.S.C. § 1519. They contend that, "other than the backdating itself," there is no evidence to support a verdict under § 1519. This argument fails.

Again, based on the evidence at trial, a reasonable jury could make a common-sense finding that backdating a document, even if the document is otherwise authentic, constitutes falsification as contemplated by the criminal statute. *See United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008) (holding that the statute gave "fair warning" to the defendant that it applied to his conduct because "a person of ordinary intelligence" would understand that backdating a document is a falsity). When the legislation was introduced in 2002, Chairman John Conyers noted that § 1519 created a new "felony which could be effectively used in a wide array of cases where a person destroys or creates evidence with the specific intent to obstruct

(5th Cir. 1977) ("The fact of the close association of the several parties and their association with … the father … is … one circumstance from which the jury might infer knowledge.").

20

a federal agency or a criminal investigation." *United States v. Fontenot*, 611 F.3d 734, 739 (11th Cir. 2010) (Barkett, J., concurring) (citing 148 Cong. Rec. E463–01, E463 (daily ed. Apr. 9, 2002) (statement of Rep. John Conyers, Jr.); *see also United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000) (finding that a rational trier of fact could have found backdating of an I-9 form to have a tendency to influence an ICE investigation).

But even if backdating alone could be deemed insufficient to support a finding of falsification of documents under § 1519, here the jury was presented with evidence of other falsifications. For example, the jury heard evidence that in October 2010, when a compliance officer asked Bogomolova to provide additional information and documents concerning certain biotoxin awards, she obtained a form-fillable joint venture agreement from lawdepot.com and completed the form to show an agreement between companies for the use of facilities, equipment, and payroll services. (Doc. #378-1 at 163-69; Doc. #378-2 at 125-26). She altered the form to delete the automatically generated time stamp and backdated it to January 1, 2007. (Doc. #378-1 at 163-69). Bogomolova also prepared an employment contract and blank timesheets for the periods covered by the awards and asked Elena Komarova, an employee and friend, to fill them out and backdate them. (Doc. #378-1 at 255-60; Doc. #378-10 at 131-46). To be sure, when Komarova testified at trial, she stated that her timesheets accurately reflected the hours she had spent on

21

research. (Doc. #378-11 at 58-80). However, Komarova reported overlapping hours at two separate businesses for two separate projects. (*Id.*). The jury was entitled to discredit Komarova's testimony and conclude that the timesheets had been falsified. On this basis alone, there was sufficient evidence for the jury to convict on the falsification count, separate and apart from the backdating of material documents. *Mintmire*, 507 F.3d at 1289 (finding that substantial evidence exits if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

### 4. Evidentiary Findings

The Scientists challenge a number of evidentiary rulings made by the trial court. We address their arguments below.

#### a. *Miranda* and *Franks* Proceedings

In January 2014, Special Agent Tara Jones of the Defense Criminal Investigative Service secured a search warrant for Defendants' home. (Doc. #157 at 202-10). To obtain the warrant, Agent Jones described the SBIR/STTR programs generally and explained that Defendants had submitted false and duplicative proposals, and used federal funding for personal enrichment instead of as proposed. (Doc. #54-1 at 5, 11-20).

Defendants moved to suppress the evidence obtained from the warrant under *Franks v. Delaware*, 438 U.S. 154 (1978). That motion was referred to a Magistrate

22

Judge, who held a *Franks* hearing[5] and ultimately recommended denial of the motion. During the hearing, the Scientists' expert, Leigh Owens, testified extensively. (Doc. #157 at 16-200). Owens, a former attorney advisor for the Defense Contract Management Agency, testified that Agent Jones had mispresented facts related to the SBIR/STTR programs to obtain a search warrant. In the Report and Recommendation, the Magistrate Judge catalogued that the falsities allegedly contained in Agent Jones's affidavit fell into six categories:

- the "'over-arching lie'" that Defendants had to pay invoices as per the negotiated costs in their proposals; [6]
- that if Defendants' certifications are false, the Government will not award a contract or will cancel a contract if it discovers the certifications are false;
- that letters of support are not material to the awarding of a contract;
- that Defendants completed and/or bid for duplicative work;

---

[5] A *Franks* hearing is warranted where a defendant "makes a substantial preliminary showing" that an affiant made intentionally false or recklessly misleading statements (or omissions) and those statements are "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56.

[6] For example, according to Owens, some of the awards were governed by the Federal Acquisition Regulations ("FAR"), and because the government was paying for "research and development services," Defendants were free to perform the labor themselves instead of the employees, subcontractors, or consultants as described in their proposals. (Doc. #127 at 22-25, 32-37, 45-46, 88, 111-13, 160-62). This testimony was used to challenge Agent Jones's contention that agencies relied on letters of support and that Defendants' misrepresentations on locations and laboratory space would change the funding decision. (Doc. #157 at 79-108).

According to Agent Jones, SBIR/STTR policy directives administered under the FAR require performance consistent with the award proposal. (Doc. #157 at 275-76, 302). That is, if a defendant makes materially false statements to obtain the contract (even if the contract is a fixed-price contract or governed by the FAR), that defendant may have committed a fraud. (Doc. #389 at 76-77).

23

- that Defendants made false statements regarding their companies' size and number of employees; and
- that Defendants received payments that were not utilized in a manner consistent with their companies' federal contract proposals and negotiations (the "'table of fraud'").

(Doc. #142 at 15-21).   After considering each of these alleged falsities, the Magistrate Judge found no Fourth Amendment violation because Agent Jones held a reasonable belief that Defendants' conduct was illegal.  (*Id.*)

Defendants also moved to suppress evidence obtained in execution of the warrant under *Miranda v. Arizona*, 384 U.S. 436 (1966).   During the pretrial *Miranda* hearing conducted by the Magistrate Judge, Agents Mazzella, Galle, and Searle testified that no agent ever conducted a "pat down" of the Scientists.  (Doc. #114 at 24, 98, 102, 137-38, 181, 190-92, 199).  Aldissi testified, however, that an agent had indeed "patted [him] down."   (Doc. #114 at 280-81, 284, 290).  The testimony of the Scientists and the Agents conflicted in other ways as well.

Aldissi testified that no one explained his non-custodial rights to him, the Agents raised their voices and became frustrated with him, and the Agents refused his request to have his wife (Bogomolova) with him during questioning.  (Doc. #114 at 257, 260-62, 264-65, 280, 291).  Bogomolova testified that no one explained her non-custodial rights to her when questioning began, the Agents were nagging, she was told she needed to be questioned separately from her husband (Aldissi), and Agents raised their voices at her.  (Doc. #114 at 300, 305-06, 310, 315, 317-18, 333).

24

In contrast, the Agents testified that the Scientists were informed of their non-custodial rights and encouraged to "keep [their] chin[s] up." (Doc. #114 at 20, 24-25, 49, 66, 72).

The Magistrate Judge determined that the interrogations were non-custodial and made the following credibility findings in favor of the Agents:

- "At no time … did the agents pat down, handcuff Defendants, display their weapons, or otherwise subject them to physical restraint;"
- "[A]gents told both Defendants it was a voluntary interview, they could leave at any time, and they did not need to answer any questions;"
- "[A]gents repeatedly asked Defendants if they were comfortable or if they needed to use the restroom or get a drink. The interviews were not conducted in a hostile manner, and Defendants' responded calmly to the agents' questions;"
- Agents "asked" to interview Defendants rather than command them; and
- Agents "explained" the consent form to Aldissi.

(Doc. #113 at 5, 6, 9). Based in part on these findings, a thumb drive seized from the storage unit was found admissible at trial. That thumb drive contained the forged letters of support, proposals, and timesheets that were introduced at trial. (Government Exh. 54X).

During trial, Agent Norman Conley, who did not take the stand at the *Miranda* hearing, testified that he had indeed patted down Aldissi while executing the search warrant. In response, the Scientists moved to reopen the *Miranda* and *Franks* hearings. The district court denied the motion to reopen, concluding that while the veracity of the "pat down" made it a "closer call," it did not change the

previous conclusion that the interrogations were non-custodial based upon the totality of the circumstances.  (Doc. #266 at 5-16; Doc. #378-15 at 232).

The Scientists argue on appeal that the court should vacate and remand with instruction to grant the *Franks* motion or reopen the *Miranda* and *Franks* hearings.

i.    Review of the Denial of the *Franks* Motion

Findings of fact related to the denial of a *Franks* motion after an evidentiary hearing are reviewed for clear error and mixed questions of law and fact are reviewed *de novo*.  *United States v. Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010); *United States v. Wuagneux*, 683 F.2d 1343, 1355 (11th Cir. 1982).  Here, the Scientists argue that certain of the Magistrate Judge's conclusions, decided on purely legal grounds, should be overturned on *de novo* review.  Those contested legal conclusions are as follows: (1) Agent Jones reasonably interpreted the regulations governing Defendants' contracts; (2) the construction of FAR is different from the construction of SBIR/STTR; and (3) the FAR does not apply to SBIR/STTR contracts.  (Doc. #142 at 18-19).

On *de novo* review, we cannot say that the legal conclusions made about the interplay between the FAR and SBIR/STTR were incorrect.  While the FAR does apply to a certain extent to SBIR/STTR, other rules also govern these types of

26

awards.[7]  Moreover, although an expert on the FAR, Owens was unable to rebut Agent Jones's statements related to SBIR contracts.

For these reasons, we find no legal error in the trial court's denial of the *Franks* motion.

> ii.    Analysis of the Denial to Reopen the *Miranda* and *Franks* Hearings

We review a denial of a motion to reopen *Miranda* and *Franks* hearings based on newly discovered evidence for abuse of discretion.  *United States v. Simms*, 385 F.3d 1347, 1356 (11th Cir. 2004).  The abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."  *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004).  The Scientists contend that when Agent Conley testified at trial that Aldissi had indeed been patted down, the credibility determinations made by the Magistrate Judge in the Agents' favor were necessarily called into question.  That is, they argue that under a totality of the circumstances standard, the court should have reached a conclusion that they were subjected to a custodial interrogation.

---

[7] For example, the SBIR policy directive from 2012 states: "[i]t is recognized that the [FAR] and agency supplemental regulations may need to be modified to conform to the requirements of the final Policy Directive." 77 Fed. Reg. 46806, 46815 (Aug. 6, 2012). The statute itself provides for compliance with SBIR/STTR guidelines and makes no mention of the FAR. 15 U.S.C. § 638b(a)(2)(D) (imposing "a requirement that each applicant for and small business concern that receives funding under the SBIR program or the STTR program shall certify whether the applicant or small business concern is in compliance with the laws relating to the SBIR program and STTR program and the conduct guidelines established under the SBIR Policy Directive and the STTR Policy Directive").

27

The problem for the Scientists is that, given abuse of discretion review, this argument requires a substantial leap in reasoning, a leap too far. They argue that because an Agent testified he patted down Aldissi, it must also be true that other circumstances suggested that the Scientists were subjected to a custodial interview. This argument misses the target. First, even if Agent Conley patted down Aldissi, and the other agents were unaware of that "pat down," that fact does not *a fortiori* call into question the credibility of Agents Mazzella, Galle, and Searle. Second, the "patting-down" of Aldissi does not itself make the interrogation custodial in nature. The Scientists were questioned in their home and were not questioned for more than four hours. They were free to come and go during the process, as evidenced by Aldissi leaving the residence to pick up his child from school. For these reasons, the district court did not abuse its discretion in denying the motion to reopen the *Miranda* and *Franks* hearings. *See United States v. Lee*, 68 F.3d 1267, 1273 (11th Cir. 1995) (newly discovered evidence must be material to the ultimate inquiry).

> b. Failure to Grant a Mistrial Because "Mahmoud" and Other Potentially Inflammatory Words Were Not Stricken from the Indictment and Trial Evidence

The Scientists next argue that the district court abused its discretion when it denied their motions for mistrial. They maintain that the refusal to strike the terms "Mahmoud," "fraud money," "debarment," "totally fraudulent," and "anthrax" deprived them of a fair trial. They argue that these terms were so harmful that no

28

limiting instruction could "un-ring the bell." *United States v. Blakey*, 14 F.3d 1557, 1559-61 (11th Cir. 1994) (cautionary jury instructions cannot remedy certain colorful words or inflammatory evidence). After careful consideration, we conclude these arguments fail to establish abuse of discretion. *Frazier*, 387 F.3d at 1259.

"Mahmoud" was Aldissi's given name at the time the Indictment was filed. (Doc. #377 at 51-52). Moreover, throughout the trial Aldissi was referred to as "Aldissi," not as "Mahmoud," and there was no mention of his religion. And while other purportedly "inflammatory" words used at trial appeared in emails, their context was explained to the jury.[8] Juries are presumed to have followed the court's instructions, and most relevant evidence is prejudicial to the accused in a criminal trial. *United States v. Roy*, 855 F.3d 1133, 1186 (11th Cir. 2017) (en banc); *United States v. Tobon-Builes*, 706 F.2d 1092, 1102 (11th Cir. 1983).

For these reasons, we conclude the district court did not abuse its discretion in denying motions for a mistrial based on certain allegedly inflammatory evidence used at trial.

B.    The Sentencing Issues

The guideline imprisonment range for both Aldissi and Bogomolova was calculated by Probation to be 324 to 405 months. (Aldissi PSR ¶ 126; Bogomolova

---

[8] For example, a witness's reaction that Defendants' use of the witness's name and signature was "absolutely fraudulent" was factually accurate (Doc. #378-6 at 95-100), as were references to fraud, anthrax, and anthrax stimulants. (Government Exhibits 7.6A, 22.2A, 53C).

PSR ¶ 128). That range was based on a total offense level of 41 and a criminal history category of I. (*Id.*). In its calculation, the Probation Office recommended a 22-level enhancement under U.S.S.G. § 2B1.1 based on an intended loss of $24,522,386, which included both funded and un-funded proposals. (Aldissi PSR ¶¶ 47-48, 73; Bogomolova PSR ¶¶ 48, 49, 74). In addition, the Probation Office recommended a 4-level enhancement under U.S.S.G. § 2B1.1 for more than 50 victims (13 defrauded government agencies and 77 individual victims of identity theft), a 2-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A) for using special skill and sophisticated means, a 2-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, and restitution in the amount of $10,654,969. (Aldissi PSR ¶¶ 73, 77, 78, 138; Bogomolova PSR ¶¶ 74, 78, 79).

At sentencing and on appeal, Defendants object to the loss calculation, the restitution amounts, and the enhancements.[9] (Doc. #379 at 6, 46). They argue that the amount of loss is unduly harsh and fundamentally flawed because no loss was intended (Doc. #326 at 6-7; Doc. #328 at 16-19), that the restitution figure cannot be determined in that there was no quantifiable dollar loss (Doc. #379 at 46), and that all the additional enhancements imposed are inapplicable – *i.e.*, enhancements based on the number of victims and use of educational institutions and special skill,

---

[9] Defendants submitted factual objections to the Probation Office, but at the time of the sentencing hearing noted that "for the purposes of this proceeding and to make effective use of the time, they are not really material to go over those." (Doc. #379 at 5-6).

and obstruction of justice.[10]  (Doc. #379 at 30, 35, 39).  We address each of these arguments below.

### 1.  Loss Calculation

After careful review, and for the reasons explained below, we find no error in the sentencing court's loss calculation.

### a.  Factual Background

The PSRs calculated the total amount of the intended loss to be $24,522,386. (Aldissi PSR ¶ 48; Bogomolova PSR ¶ 49).  Of that amount, $10,654,969 was the total amount applied for and received, and the remaining $13,867,417 reflects the amount applied for by the Scientists but not awarded.  (*Id.*).  This combined loss figure led to an application of a 22-level enhancement above the base offense level of 7.  (Aldissi PSR ¶¶ 48, 73; Bogomolova PSR ¶¶ 49, 74).  The Scientists argue that this loss calculation is unsustainable because there was "no reasonably foreseeable pecuniary harm" in the form of "actual loss," nor was there "intended loss" because they fully performed on all awarded contracts and there was no evidence to show

---

[10] The district court ruled that the intended loss was correctly calculated based on the entire amount of the contracts applied for and that all enhancements were proper.  (Doc. #379 at 27-28, 34, 38, 45, 54-55).  The district court ordered restitution in the amount of $10,654,969 for distribution to victims with payment to be made jointly and severally. (Doc. #379 at 85). Ultimately the court agreed with the prosecution that a downward departure was in order, but noted that absent the prosecutor's recommendation "I don't think that … I would have departed this far down." (Doc. #379 at 85).

that they would not have performed on un-awarded contracts.  In particular, they

contend that

> [t]he loss amount in the PSR reflects proposals and contracts
> dating back to 1998, six years prior to the alleged start of the
> conspiracy, and includes funded awards for which the
> Defendants performed and submitted final reports, each
> demonstrating months (or years) of experimental results.  Some
> of these results were published in peer-reviewed articles.
> Evaluations of the work show that the reports were accepted and
> satisfactory, even during the time Dr. Aldissi was being
> investigated by the Government.  In fact, NASA scientists were
> eager to receive the Defendant's research.  NASA evaluators
> obviously respected the quality of Dr. Aldissi's research, and
> aside from granting him SBIR contracts, they paid him as a
> consultant.

(Doc. #326 at 8, 9; U.S.S.G. § 2B1.1 n.3(E)(i)).  Actual performance, the Scientists

argue, reduces the amount of loss on the awarded contracts to $0.  And, because

there is no evidence proving Defendants would not have performed on any of the

unawarded proposals, they contend that the intended loss must also be reduced to

$0.  (Doc. #326 at 9).  Finally, Defendants argue that it was clear error for the district

court to make a finding on the amount of the intended loss without testimony.  We

reject each argument.

### b.  Standard of Review

We review the district court's guideline fact findings for clear error.  *United*

*States v. Crawford*, 407 F.3d 1174, 1177-78 (11th Cir. 2005); *United States v. Ward*,

222 F.3d 909, 910 (11th Cir. 2000).  Clear error will be found only if this Court is

32

"left with a definite and firm conviction that a mistake has been committed." *Crawford*, 407 F.3d at 1177. A district court's estimate of loss need only be reasonable.[11] U.S.S.G. § 2B1.1, comment n.3(C) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference."). The Government bears the burden of proving loss with reliable and specific evidence. *Maxwell*, 579 F.3d at 1305.

c. Analysis

The sentencing guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment n.3(A)(i). Pecuniary harm "means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." *Id.*, comment n.3(A)(iii). If a loss cannot be reasonably determined, the Guidelines instruct the courts to "use the gain that resulted from the offense as an alternative measure of loss." *Id.*, comment n.3(B). However, § 2B1.1 also contains a specific provision that addresses how loss is to be calculated when the fraud or deceit involves a government benefit,

---

[11] Before sentencing, the Scientists sought a continuance to allow new sentencing guidelines to take effect. That continuance was denied. Therefore, the 2014 sentencing guidelines apply to their conduct. (Doc. #379 at 4; Aldissi PSR ¶ 66; Bogomolova PSR ¶ 67). All references to the sentencing guidelines made herein refer to the 2014 version, unless otherwise noted.

33

*i.e.*, "grants, loans, entitlement program payments." In that event, loss is "not less than the value of the benefits obtained by the unintended recipients or diverted to unintended use." U.S.S.G. § 2B1.1, comment n.3(F)(ii) ("For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50."). The term "loss" includes intended loss – pecuniary harm that was intended to result from the offense and pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value). U.S.S.G. § 2B1.1, comment n.3(A)(ii).

In *Maxwell*, we found this provision applied where a program existed "to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry." *Maxwell*, 579 F.3d at 1306. Where the defendants obtained $7,974,674, and were actually entitled to none of that amount, the proper calculation of loss was $7,974,674. *Id.* at 1307.

Here, trial evidence explained that the primary purpose of the SBIR and STTR programs is to fund eligible proposals of small businesses to bring products to market.[12] Factual statements contained in the PSRs, which were not objected to by

---

[12] In fact, the SBIR program was added to the Small Business Act in 1958 because Congress found that federal research projects went primarily to large firms which in turn led to large federal procurement contracts going to those same large firms who had developed products from those

34

the Scientists, outline the purposes of the programs are to "stimulate U.S. technological innovation," "increase private-sector commercialization of innovations derived from federal research and development," and "promote cooperative research and development with non-profit research institutions." (Aldissi PSR ¶ 12; Bogomolova PSR ¶ 13). Trial testimony further established that the SBIR program's purposes were to stimulate research and innovation, ensure that small businesses have the opportunity to participate in research with federal dollars, foster participation by women and those in socially and economically disadvantaged groups, and encourage the private sector to piggyback on the federal research and try to commercialize that research. (Doc. #378-2 at 105). In addition, the evidence at trial revealed that the STTR program was similar, but it required partnership between a small business and a research institution, frequently a university. (Doc. #378-2 at 107-08).

To be eligible for Phase 1 or Phase 2 awards under these programs, awardees must qualify as small business concerns, principal investigators must be primarily employed with the small business concern, and the research must be performed domestically. (Doc. #378-2 at 141-44, 199-202). Phase 1 applicants must disclose

---

federal grants. *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 530 F. Supp. 2d 888, 892 (S.D. Tex. 2008) (citing S. REP. NO. 85-1714 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3071, 3076). "Considering the funds tunneled annually into research performed by small businesses, the SBIR has remained true to its stated purpose, allowing small businesses to compete on a level playing field with large research firms and universities." *Id.* at 893.

35

detailed descriptions of their physical facilities' availability, location, and instrumentation.    (Doc. #378-2 at 145).    The agency screens all proposals, eliminating any that are ineligible, and provides the eligible proposals to a panel of experts. (Doc. #378-4 at 168, 209-11).  The experts score the proposals for technical merit, considering whether the business has the appropriate personnel, consultants, facilities, equipment, and industry partners to perform the research and achieve the commercialization goal.  (*Id.* at 186).

The budget which accompanies a proposal is important to the process, because it permits the evaluator to understand how the company intends to use the awarded funds if it is the successful bidder.  (Doc. #378-2 at 186; Doc. #378-3 at 33-35; Doc. #378-6 at 26).  If a company spends less on consultants or materials than the proposal's budget provides, the company is not free to retain the excess funds as profit because the percentage of profit that the company can make is capped.  (Doc. #378-2 at 136-37; Doc. #378-3 at 103-04; Doc. #378-9 at 76-78).  Nor may a company use funds on other costs unless its Principal Investigator notifies and obtains permission from the program director.  (Doc. #378-4 at 172, 199; Doc. #378-5 at 22-24; Doc. #378-7 at 203).  Awardees must submit monthly reports to be evaluated by technical monitors.  (*Id.* at 185-86, 226).

Under clear error review, we find that § 2B1.1 applies here for purposes of calculating the total offense level, and the offense level was properly increased by

36

22. Just as in *Maxwell*, the loss here involves a government benefit. *Maxwell*, 579 F.3d at 1306 (noting evidence presented at trial made clear that the primary purposes of the programs at issue were to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry). The legislative history of the SBIR/STTR programs, and the evidence in this case, demonstrate that the purpose of these programs is to help small businesses obtain government research contracts. S. REP. NO. 85-1714 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3071, 3076. Yet, the Scientists applied for and undertook the work under the contracts even though they knew they were *not eligible or qualified*[13] to receive funds under the government program. The benefit of the bargain for the government included the ability to consider and award money to *eligible* deserving small businesses that could realistically bring a product to commercialization. That is precisely what the Scientists denied to the government, in the intended amount of $24,522,386. *See United States v. Menichino*, 989 F.2d 438, 442 (11th Cir. 1993) (holding that in the context of fraud cases, sentencing

---

[13] At the sentencing hearing, the prosecutor explained the point this way: "These defendants were unintended recipients. They were unintended in two different ways. They were unintended because they were lying to receive the award, but they were also unintended because for many of the awards they were simply ineligible. … The truth, over and over again, [is] they simply could not have gotten the awards. They lied to receive them. They were ineligible. They were, in fact, unqualified. They were receiving awards they shouldn't have." (Doc. #379 at 22-23). "The reports provided by the defendants were not what the government bargained for. We bargained for qualified PIs, for research and development done in the United States, for real entities to do the real research, not what we have here, which were lies told by folks to get grants, to never commercialize, to never lead to anything that would matter." (*Id.* at 25).

based on intended loss is appropriate even where no actual loss occurred); *United States v. Grant*, 431 F.3d 760, 764 (11th Cir. 2005) (explaining that once a defendant has gained access to a credit line by fraudulently applying for credit cards, a district court does not err in determining the amount of the intended loss as the total line of credit to which the defendant could have access, especially when the defendant presents no evidence that he did not intend to utilize all of the credit available on the cards); *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011) (explaining that a district court may base its loss amount determination on factual findings derived from, among other things, evidence heard during trial).

We conclude the district court made a reasonable estimate of the loss and we will not disturb its findings on clear error review.[14]

2. Restitution

Aldissi's PSR sets out a total of thirteen government agencies which were defrauded out of money earmarked for small businesses for a total restitution amount of $10,654,969. (Aldissi PSR ¶¶ 57, 58, 137, 138). Bogomolova's PSR sets out the

---

[14] Further, we conclude the district court was not required to hold a hearing on the total amount of the intended loss. The PSRs specified the precise amounts for the intended loss. (Aldissi PSR ¶ 48; Bogomolova PSR ¶ 49). The Scientists did not object to the factual statement that $13,867,417 was applied for but not awarded. *See United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989) (holding that a district court can rely on undisputed factual statements in a presentence investigation report when it makes findings of fact). Their argument was limited: there should be no intended loss from the contracts not received, because there was intent to fully perform on those contracts. (Doc. #326 at 9). And as explained earlier, the performance argument is a non-starter because the damage to the United States occurred at the moment the grants were applied for.

same victims and same loss amount.  (Bogomolova PSR ¶¶ 57, 58, 139, 140).  In their objections, Aldissi and Bogomolova incorporate their loss arguments, arguing that the restitution amount is miscalculated because the agencies received the benefit of their bargain and that to further impose restitution would essentially result in a windfall to the agencies.

This argument fails for the same reasons as the arguments on the sufficiency of the wire fraud convictions and the calculation of the loss.  *See* Section III.A.1. and B.1., *supra*.  The government did not get what it bargained for; therefore, under clear error review, the amount of restitution was properly calculated.  *United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008) ("We review for clear error factual findings underlying a restitution order.").

### 3.  Enhancement Based on Number of Victims

Each Defendant's PSR recommended a 4-level enhancement under U.S.S.G. § 2B1.1(2)(B) based on a determination that there were a total of 77 victims of identity theft.  (Aldissi PSR ¶ 73; Bogomolova PSR ¶ 74).  The Scientists argue that *at most* a 2-level enhancement should apply because only 19 victims testified at trial. We disagree, and again note that we review the district court's factual finding related to the 4-level enhancement for clear error.  *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015); *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir.

2010) (holding that for a factual finding to be clearly erroneous, we must have a definite and firm conviction that a mistake has been made).

The district court's conclusion that the offense involved more than 50 victims was based on reliable and specific evidence. Although only 19 victims testified at trial, a total of 77 victims of identity theft were identified in the PSRs. (Aldissi PSR ¶¶ 24, 25, 32, 34, 36, 37, 38, 41-46; Bogomolova PSR ¶¶ 25, 26, 32-40, 42-47). The thumb drive introduced at trial contained 77 folders, and each folder related to an individual whose identity was collected. And, the Scientists prepared false letters of support involving more than 50 victims. (Government Exh. 54X at 20.2, 23.3). Each of those stolen identities qualify as a "victim" in this "means of identification" case because by definition the term "victim" includes "any individual whose means of identification was used unlawfully or without authority," not just those who can be shown to have suffered pecuniary loss or bodily injury. U.S.S.G. § 2B1.1(b)(2)(A), comment n.4(E)(ii); *Ford*, 784 F.3d at 1397 (finding pecuniary harm unnecessary to apply the enhancement in accordance with comment n.4(E)(ii)); *United States v. Ellisor*, 522 F.3d 1255, 1275 (11th Cir. 2008).

The district court did not clearly err by concluding that more than 50 victims were harmed by the Scientists' offense conduct.

4. Enhancement for Acting on Behalf of Educational Institutions

Each PSR recommended a 2-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A)[15] for the Scientists' misrepresentations that they were acting on behalf of educational institutions, namely the University of Florida, the University of South Florida, and Louisiana State University. (Aldissi PSR ¶ 74; Bogomolova PSR ¶ 73). Defendants contend that they were not acting "on behalf of" the educational institutions, but rather were acting "on behalf of" their own companies. Accordingly, they argue that the enhancement does not apply to them because they never represented themselves as acting on behalf of, or for the benefit of, an educational institution.

While Defendants certainly did not represent that the money obtained through contracts and grants would all go directly to educational institutions, evidence presented at trial established that the fraudulent budget proposals reflected money being used to pay educational institutions. (Doc. #379 at 37; Government Exh. 2.2A, 7.2A, 8.2). For example, proposals included fake bids and consulting fees from university professors, whose fees – had they been real – would have been paid to their universities. (Doc. #379 at 37-38). Instead, the Scientists kept that money for themselves. "They submitted quotes to the government in which they said the

---

[15] The text of that subsection states, "[i]f the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency … increase by 2 levels." U.S.S.G. § 2B1.1(b)(9).

specific amounts of money had been quoted by the educational institutions to perform the work on the awards, but they never intended to pay the institutions." (Doc. #379 at 38).    This constitutes reliable and sufficient evidence that the Scientists misrepresented their role as acting on behalf of educational institutions. *See Ellisor*, 522 F.3d at 1275-76 (finding that a defendant who claimed a university sponsored a show and forged signatures on university letterhead was subject to the enhancement).  The district court did not err in applying this enhancement.

5.  Enhancements for Special Skill and Sophisticated Means

The PSRs included two-level enhancements for the use of special skill and sophisticated means under U.S.S.G. §§ 3B1.3 and 2B1.1(b)(10)(C).  "Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, comment n.9(B).  "Special skill" refers to "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3, comment n.4.  In evaluating whether a defendant qualifies for the enhancements, the proper focus is on the offense conduct as a whole, not on each individual step.  *See Barrington*, 648 F.3d at 1199 ("Each action by a defendant need not be sophisticated in order to support this enhancement.").

42

Aldissi's PSR noted his degree of "Doctorate of the State" in Polymer Science in 1981, while Bogomolova's noted that she "earned the equivalent of a Ph.D. in Chemistry in 1991." (Aldissi PSR ¶ 77; Bogomolova PSR ¶ 78). The PSRs also noted the Scientists' "position[s] in the scientific community allowed [them] access to information about other scientists and educational institutions which [they] used to facilitate the offense and which are not possessed by the general public." (*Id.*). In submitting falsified applications, Aldissi and Bogomolova "use[d] scientific jargon, not commonly familiar to the general public, to induce various federal government agencies/entities to award him and Bogomolova $24,522,386." (*Id.*).

Aldissi and Bogomolova argue that no special skill or expertise was used to facilitate the offense. (Doc. #326 at 12; Doc. #328 at 21-23). We disagree. The Scientists used their skill and expertise in science, as well as their nonpublic knowledge of members of the scientific community, to make their proposals attractive to the defrauded organizations such that they would be awarded the grants they sought. *United States v. Garrison*, 133 F.3d 831, 842 (11th Cir. 1998) ("[S]ection 3B1.3 envisions … a physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question."). That is, they used their special skills to facilitate the offense. Moreover, considering the Scientists' use of knowledge and access beyond that of the general public, the offense as a whole was sophisticated even if

43

portions of it, *i.e.*, crude Photoshop techniques, were not. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) ("There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated.").

For these reasons, the district court did not clearly err in imposing the two-level increase for use of special skill and sophisticated means. *See id.* at 1267-68 (reviewing a district court's findings of fact related to the imposition of a sophisticated means enhancement for clear error and concluding that the district court did not clearly err in finding sophisticated means when the defendant, among other things, "conduct[ed] extensive research on the victim companies to develop inside information which facilitated the scheme to defraud [and] forged false company documents," including by referencing a nonpublic account number).

6. Enhancement for Obstruction of Justice

The Scientists also challenge the district court's imposition of a sentencing enhancement for obstruction of justice. Section 3C1.1 provides for a two-level enhancement:

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense ….

44

U.S.S.G. § 3C1.1. The commentary further provides that "[i]f the defendant is convicted both of an obstruction offense" as well as "an underlying offense," then the "count for the obstruction offense will be grouped with the count for the underlying offense." U.S.S.G. §3C1.1, comment n.8. The offense level is then calculated by taking either the underlying offense level and increasing it by two levels, or by using the offense level for the obstruction offense, if it is greater. *Id.*

Defendants argue that the district court improperly applied this enhancement because it "double counted" conduct that had previously been incorporated with Counts 14 and 15 of the Indictment. In response, the government contends that this does not constitute double counting because the guidelines call for the application of the two-level enhancement.

A claim of double counting is reviewed under the guidelines *de novo*. *United States v. Webb*, 665 F.3d 1380, 1382 (11th Cir. 2012). "Impermissible double counting occurs only when one part of the [g]uidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the [g]uidelines." *Id.* But double counting a factor is permissible if the Sentencing Commission "intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing." *Id.* And this Court presumes that, absent a specific direction to the contrary, the Sentencing Commission "intended to apply separate sections

45

cumulatively." *Id.* Therefore "a defendant asserting a double counting claim has a tough task." *Id.*

Here, the district court did not engage in impermissible double counting because it merely followed the guidelines by grouping the convictions for conspiracy to commit wire fraud, wire fraud, and obstruction together, determining that the base offense level for wire fraud was higher than that for obstruction convictions, and adding the two-level enhancement as mandated by the guidelines. U.S.S.G. § 3C1.1, comment n.8.

### 7.  Substantive Reasonableness of the Sentence

Finally, Aldissi and Bogomolova's sentences also survive review for substantive reasonableness. Substantive reasonableness is reviewed under the deferential abuse of discretion standard. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). So, we will reverse only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190.

A sentence is substantively unreasonable if the district court "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* at 1189 (internal quotation marks

46

omitted).  The weight to be afforded to any specific factor is committed "to the sound discretion of the district court" and the appeals court "will not substitute [its] judgment in weighing the relevant factors." *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007).  The fact that a sentence falls within the guidelines is one indicator of its reasonableness.  *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).  In addition, we ordinarily expect that a sentence imposed well below the statutory maximum is an indicator of reasonableness.  *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

Here, the district court properly calculated the guideline range, expressly referenced the presentence investigation reports, and considered the arguments of the parties. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (finding that the court may exercise its discretion to give greater weight to some sentencing factors over others).  The district court clearly and cogently explained its basis for the sentences imposed and referenced the sentencing factors.  Given the circumstances of the offense, the district court in the exercise of its discretion, varied downward, and pronounced what was, in its view, "a very compassionate sentence."  (Doc. #379 at 91).  The guideline range for both Aldissi and Bogomolova was 324 to 405 months.  (Aldissi PSR § 126; Bogomolova PSR § 128).  Aldissi was sentenced to 180 months, and Bogomolova to 156 months.  Both sentences reflect substantial variances below the guideline range.  We note that given

47

the pervasiveness of the fraud and the impact it had on the professional reputations of the identity-theft victims, higher sentences could have been imposed.

For all these reasons, we readily conclude the district court did not abuse its considerable discretion, and the Scientists' sentences are substantively reasonable.

IV.    CONCLUSION

For the foregoing reasons, the convictions and sentences of each Defendant are AFFIRMED.